ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25 15:30:26
60CV-17-3863
C06D12 : 41 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
### _____ DIVISION

| | |
|---|---|
| James Green, as Special Administrator<br>Of the Estate of Felix Williams, deceased; Mercedes Anderson,<br>as Attorney-in-Fact of Kesha McBrayer; Brenda Woodard,<br>as Attorney-in-Fact of Abraham Woodard; on behalf of themselves<br>and All Others Similarly Situated | **PLAINTIFFS** |

vs.                                        **CASE NO.** _____

| | |
|---|---|
| Skyline Highland Holdings, LLC; JS Highland Holdings, LLC;<br>Joseph Schwartz; Highlands of Little Rock Riley Holdings, LLC<br>d/b/a Hillview Post-Acute and Rehabilitation Center; Highlands<br>of Little Rock West Markham Holdings, LLC d/b/a Little Rock<br>Post-Acute and Rehabilitation; Highlands of North Little Rock<br>John Ashley Holdings, LLC d/b/a North Little Rock Health and<br>Rehabilitation Center; Highlands of Little Rock South Cumberland<br>Holdings, LLC d/b/a Capital Health and Rehabilitation Center;<br>Mishana Jackson, in her capacity as Administrator of Hillview<br>Post-Acute and Rehabilitation Center; Tracy Holder, in her<br>capacity as Director of Nursing of Hillview Post-Acute and<br>Rehabilitation Center; Ashley Taylor, in her capacity as Director<br>of Nursing of Hillview Post-Acute and Rehabilitation Center;<br>Lindsey Clyburn, in her capacity as Administrator of Little Rock<br>Post-Acute and Rehabilitation; Marty Tolbert, in his capacity as<br>Administrator of Little Rock Post-Acute and Rehabilitation;<br>Brittney DeVazier, in her capacity as Administrator of Little Rock<br>Post-Acute and Rehabilitation; Christina Lea Light, in her capacity<br>as Director of Nursing of Little Rock Post-Acute and Rehabilitation;<br>Cara Harris, in her capacity as Director of Nursing of Little Rock Post<br>Acute and Rehabilitation; Jill Lapaglia, in her capacity as Director of<br>Nursing of Little Rock Post-Acute and Rehabilitation; Patricia Cahoone;<br>in her capacity as Director of Nursing of Little Rock Post-Acute and<br>Rehabilitation; Cynthia Dughetti, in her capacity as Administrator of<br>North Little Rock Health and Rehabilitation Center; Shantel Mitchell,<br>in her capacity as Director of Nursing of North Little Rock Health and<br>Rehabilitation Center; Amanda Wallace, in her capacity as Administrator<br>of Capital Health and Rehabilitation Center; Angela Tart, in her capacity<br>as Administrator of Capital Health and Rehabilitation Center; and<br>Catherine Atlas, in her capacity as Director of Nursing of Capital Health<br>and Rehabilitation Center | **DEFENDANTS** |

## CLASS ACTION COMPLAINT

1

COMES NOW, the Plaintiffs, on behalf of themselves and all others similarly situated, by and through their attorneys, Reddick Moss, PLLC, and the Campbell Law Firm, P.A., and for their causes of action against the Defendants, state as follows:

### INTRODUCTION

1.     The class claims of this Complaint are that the Defendants' engaged in a civil conspiracy, pursued a common plan and design and acted in concert to create a deceptive business practice of chronically understaffing the Facilities which violated the residents' statutory and contractual rights and unjustly enriched the Defendants. Plaintiffs allege that the Defendants engaged in a deceptive business practice of chronically understaffing the Facilities, breached the Admission Agreement and the Provider Agreement, violated the Arkansas Deceptive Trade Practices Act ("ADTPA") and violated the Residents' Rights Act. Plaintiffs seek damages for breach of the Admission Agreement and breach of the Provider Agreement. Plaintiffs also seek damages under the ADTPA as well as damages for unjust enrichment for receiving payments they were not legally entitled to receive by engaging in the deceptive business practice of understaffing the Facilities and violating state and federal staffing laws, including the Residents' Rights Act.

2.     This complaint includes a request that a class be certified consisting of all residents and estates of residents who resided at Hillview Post-Acute and Rehabilitation Center; Little Rock Post-Acute and Rehabilitation; North Little Rock Health and Rehabilitation Center; and Capital Health and Rehabilitation Center ("the Facilities") from April 1, 2016 through the present ("Class Period"), as well as a prayer for compensatory, economic and punitive damages, attorney's fees, interest, and costs. Excluded from the Class are residents and estates of residents that have sued in the past or currently have lawsuits pending against any of the Defendants, and all employees of the Court in which the case in pending.

2

### CLASS ACTION COMPLAINT

### PARTIES.

3.      Mercedes Anderson is the daughter and Attorney-in-Fact of Kesha McBrayer pursuant to the Durable Power of Attorney executed on January 5, 2015, a copy of which is attached hereto as **Exhibit A**. Mercedes Anderson brings this action on behalf of Kesha McBrayer and all other residents of the Facilities ("Plaintiff Class") for the period April 1, 2016, to present ("Class Period"). Other than hospitalizations, Kesha McBrayer was a resident of Hillview Post-Acute and Rehabilitation Center, a nursing home located at 8701 Riley Drive, Little Rock, Arkansas, from approximately February 20, 2017 until May 9, 2017.

4.      James Green is the brother and was the Attorney-in-Fact of Felix Williams pursuant to the Durable Power of Attorney executed on February 19, 2016, a copy of which is attached hereto as **Exhibit B**. Felix Williams died on July 18, 2017, and James Green is the Special Administrator of the Estate of Felix Williams, deceased. See **Exhibit C**. James Green brings this action on behalf of Felix Williams, and all other residents of the Facilities ("Plaintiff Class") for the period April 1, 2016 to present ("Class Period"). Other than hospitalizations, Felix Williams was a resident of Little Rock Post-Acute and Rehabilitation, a nursing home located at 5720 West Markham Street, Little Rock, Arkansas, from approximately December 5, 2015 until June 24, 2017

5.      Brenda Woodard is the spouse and Attorney-in-Fact of Abraham Woodard pursuant to a Durable Power of Attorney, a copy of which is attached hereto as **Exhibit D**. Brenda Woodard brings this action on behalf of Abraham Woodard and all other residents of the Facilities ("Plaintiff Class") for the period April 1, 2016 to present ("Class Period"). Other than hospitalizations, Abraham Woodard was a resident of North Little Rock Health and Rehabilitation Center, a nursing

3

home located at 2501 John Ashley Drive, North Little Rock, Arkansas, from approximately May 31, 2017 until June 6, 2017.

      6.     Defendant JS Highland Holdings, LLC is an Arkansas limited liability company (**Exhibit E**) authorized to conduct business in the State of Arkansas that owned, operated, controlled and managed the Facilities and Skyline Highland Holdings, LLC at all times relevant to this lawsuit. **Exhibit F.** Joseph Schwartz is the sole owner and member of Defendant JS Highland Holdings, LLC. At all times material to this action, JS Highland Holdings, LLC managed and controlled, directly and indirectly, the Facilities and Skyline Highland Holdings, LLC, was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The causes of action set forth herein arise out of the business conducted and decisions made and implemented by Defendant JS Highland Holdings, LLC during the Class Period. The agent for service of process on Defendant JS Highland Holdings, LLC is Heartsill Ragon, III, 425 W. Capitol Avenue, Suite 3800, Little Rock, Arkansas 72201.

      7.     Defendant Skyline Highland Holdings, LLC is an Arkansas limited liability company (**Exhibit G**) which is authorized to conduct business in the State of Arkansas that wholly owned, operated, controlled and managed the Facilities during the Class Period. Defendant Skyline Highland Holdings, LLC is owned and managed by JS Highland Holdings, LLC. **Exhibit F.** At all times material to this action, Skyline Highland Holdings, LLC managed and controlled, directly and indirectly, the Facilities, was a control person as defined in Ark. Code Ann. §4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The causes of action set forth herein arise out of the business conducted and decisions made by Defendant Skyline Highland Holdings, LLC during the Class Period. The agent for service of process on

Defendant Skyline Highland Holdings, LLC is Heartsill Ragon, III, 425 W. Capitol Avenue, Suite 3800, Little Rock, Arkansas 72201.

8.    Defendant Joseph Schwartz, an individual whose address is 1859 54th Street D, Brooklyn, New York, 11204, directly and indirectly, owned, controlled, operated, and managed, the Facilities, JS Highland Holdings, LLC and Skyline Highland Holdings, LLC during the Class Period. The causes of action that form the basis of this complaint arise out of the conduct of and decisions made by Defendant Joseph Schwartz in the operation, management and control of the Facilities, JS Highland Holdings, LLC and Skyline Highland Holdings, LLC during the Class Period. At all times material to this action, Defendant Joseph Schwartz was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Joseph Schwartz's conduct forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief.

9.    Defendant Highlands of Little Rock Riley Holdings, LLC d/b/a Hillview Post-Acute and Rehabilitation is an Arkansas limited liability company (**Exhibit H**) that owned, operated, managed, and held the license for the nursing home located at 8701 Riley Drive, Little Rock, Arkansas, known as Hillview Post-Acute and Rehabilitation Center. Skyline Highland Holdings, LLC owns 100% of Little Rock Riley Holdings, LLC d/b/a Hillview Post-Acute and Rehabilitation Center, and JS Highland Holdings, LLC is the manager of both Skyline Highland Holdings, LLC and Little Rock Riley Holdings, LLC d/b/a Hillview Post-Acute and Rehabilitation Center. **Exhibit F.** The causes of action set forth herein arise out of the business conducted by and through Defendant Highlands of Little Rock Riley Holdings, LLC d/b/a Hillview Post-Acute and Rehabilitation Center. The agent for service of process for Defendant Highlands of Little Rock

Riley Holdings, LLC d/b/a Hillview Post-Acute and Rehabilitation Center is Heartsill Ragon, III,

425 W. Capitol Avenue, Suite 3800, Little Rock, Arkansas 72201.

10.     Defendant Highlands of Little Rock West Markham Holdings, LLC d/b/a Little

Rock Post-Acute and Rehabilitation is an Arkansas limited liability company (**Exhibit I**) that

owned, operated, managed, and held the license for the nursing home located at 5720 West

Markham Street, Little Rock, Arkansas, known as Little Rock Post-Acute and Rehabilitation.

Skyline Highland Holdings, LLC owns 100% of Highlands of Little Rock West Markham

Holdings, LLC d/b/a Little Rock Post-Acute and Rehabilitation, and JS Highland Holdings, LLC

is the manager of both Skyline Highland Holdings, LLC and Little Rock West Markham Holdings,

LLC d/b/a Little Rock Post-Acute and Rehabilitation. The causes of action set forth herein arise

out of the business conducted by and through Defendant Highlands of Little Rock West Markham

Holdings, LLC d/b/a Little Rock Post-Acute and Rehabilitation. **Exhibit F.** The agent for service

of process for Defendant Highlands of Little Rock West Markham Holdings, LLC d/b/a Little

Rock Post-Acute and Rehabilitation is Heartsill Ragon, III, 425 W. Capitol Avenue, Suite 3800,

Little Rock, Arkansas 72201.

11.     Defendant Highlands of North Little Rock John Ashley Holdings, LLC d/b/a North

Little Rock Health and Rehabilitation Center is an Arkansas limited liability company (**Exhibit J**)

that owned, operated, managed, and held the license for the nursing home located at 2501 John

Ashley Drive, North Little Rock, Arkansas, known as North Little Rock Health and Rehabilitation

Center. Skyline Highland Holdings, LLC owns 100% of Highlands of North Little Rock John

Ashley Holdings, LLC d/b/a North Little Rock Health and Rehabilitation Center, and JS Highland

Holdings, LLC is the manager of both Skyline Highland Holdings, LLC and Highlands of North

Little Rock John Ashley Holdings, LLC d/b/a North Little Rock Health and Rehabilitation Center.

6

Exhibit F. The causes of action set forth herein arise out of the business conducted by and through Defendant Highlands of North Little Rock John Ashley Holdings, LLC d/b/a North Little Rock Health and Rehabilitation Center. The agent for service of process for Defendant Highlands of North Little Rock John Ashley Holdings, LLC d/b/a North Little Rock Health and Rehabilitation Center is Heartsill Ragon, III, 425 W. Capitol Avenue, Suite 3800, Little Rock, Arkansas 72201.

12.    Defendant Highlands of Little Rock South Cumberland Holdings, LLC d/b/a Capital Health and Rehabilitation Center is an Arkansas limited liability company (**Exhibit K**) that owned, operated, managed, and held the license for the nursing home located at 1516 Cumberland St., Little Rock, Arkansas, known as Capital Health and Rehabilitation. Skyline Highland Holdings, LLC owns 100% of Highlands of Little Rock South Cumberland Holdings, LLC d/b/a Capital Health and Rehabilitation Center, and JS Highland Holdings, LLC is the manager of both and Skyline Highland Holdings, LLC and Highlands of Little Rock South Cumberland Holdings, LLC d/b/a Capital Health and Rehabilitation Center. **Exhibit F.** The causes of action set forth herein arise out of the business conducted by and through Defendant Highlands of Highlands of Little Rock South Cumberland Holdings, LLC d/b/a Capital Health and Rehabilitation Center. The agent for service of process for Defendant Highlands of Little Rock South Cumberland Holdings, LLC d/b/a Capital Health and Rehabilitation Center is Heartsill Ragon, III, 425 W. Capitol Avenue, Suite 3800, Little Rock, Arkansas 72201.

13.    Any time that the term "Corporate Defendants" is used throughout this complaint, such term collectively refers to the Facilities, Skyline Highland Holdings, LLC, and JS Highland Holdings, LLC, and the individual defendants named herein.

14.    Defendant Mishana Jackson, an individual whose address is 18121 Fawn Tree Drive, Little Rock, Arkansas, was an Administrator of Hillview Post-Acute and Rehabilitation

Center during the Class Period. Defendant Mishana Jackson was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies, procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility. Mishana Jackson is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff Hillview Post-Acute and Rehabilitation Center. At all times material to this action, Defendant Mishana Jackson was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Mishana Jackson's conduct forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief. Defendant Mishana Jackson is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

15.     Defendant Tracy Holder, an individual whose address is 5813 N. Walnut Road, North Little Rock, Arkansas, was a Director of Nursing for Hillview Post-Acute and Rehabilitation Center during the Class Period. The causes of action made the basis of this suit arise out of Defendant Tracy Holder's actions as the Director of Nursing at Hillview Post-Acute and Rehabilitation Center during the Class Period and to the clinical operation of the Facility. Defendant Tracy Holder was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility   Tracy Holder is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy

8

and common plan and design to chronically understaff the Facility. Defendant Tracy Holder is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

16. Defendant Ashley Taylor, an individual whose address is 3820 West Street, Little Rock, Arkansas, was a Director of Nursing for Hillview Post-Acute and Rehabilitation Center during the Class Period. The causes of action that make the basis of this suit arise out of Defendant Ashley Taylor's actions as the Director of Nursing at Hillview Post-Acute and Rehabilitation Center during the Class Period and the clinical operation of the Facility. Defendant Ashley Taylor was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility. Ashley Taylor is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Ashley Taylor is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

17. Defendant Lindsey Clyburn, an individual whose address is 102 Verona Lane, Maumelle, Arkansas, was an Administrator of Little Rock Post-Acute and Rehabilitation during the Class Period. Defendant Lindsey Clyburn was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies, procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility. Lindsey Clyburn is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff Little

9

Rock Post-Acute and Rehabilitation. At all times material to this action, Defendant Lindsey

Clyburn was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore

jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant

Lindsey Clyburn's conduct forms a significant basis for the claims asserted herein and from whom

Plaintiffs seek significant relief. Defendant Lindsey Clyburn is a citizen of the State of Arkansas

and subject to the jurisdiction of this Court.

      18.    Defendant Marty Tolbert, an individual whose address is 912 Heritage Cove Row,

Redfield, Arkansas, was an Administrator of Little Rock Post-Acute and Rehabilitation during the

Class Period. Defendant Marty Tolbert was designated by the Corporate Defendants to manage

and direct the day-to-day functions and overall operations of the Facility, to implement the

policies, procedures, and practices developed and required by the Corporate Defendants, and to

determine the number of staff at the Facility. Marty Tolbert is a Defendant from whom significant

relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted

by the plaintiff class as the Administrator implemented, executed and directly participated in the

civil conspiracy and common plan and design to chronically understaff Little Rock Post-Acute and

Rehabilitation. At all times material to this action, Defendant Marty Tolbert was a control person

as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the

Plaintiffs' damages. As the facts alleged herein show, Defendant Marty Tolbert's conduct forms a

significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief.

Defendant Marty Tolbert is a citizen of the State of Arkansas and subject to the jurisdiction of this

Court.

      19.    Defendant Brittney DeVazier, an individual whose address is 106 Clair Cove,

Searcy, Arkansas, was an Administrator of Little Rock Post-Acute and Rehabilitation during the

Class Period. Defendant Brittney DeVazier was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies, procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility. Brittney DeVazier is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff Little Rock Post-Acute and Rehabilitation. At all times material to this action, Defendant Brittney DeVazier was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Brittney DeVazier's conduct forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief. Defendant Brittney DeVazier is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

20.    Defendant Christina Lea Light, an individual whose address is 12754 Chambers Road, Bauxite, Arkansas, was a Director of Nursing for Little Rock Post-Acute and Rehabilitation during the Class Period. The causes of action made the basis of this suit arise out of Defendant Christina Lea Light's actions as the Director of Nursing at Little Rock Post-Acute and Rehabilitation during the Class Period and the clinical operation of the Facility.    Defendant Christina Lea Light was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility. Christina Lea Light is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil

11

conspiracy and common plan and design to chronically understaff the Facility. Defendant Christina Lea Light is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

21. Defendant Cara Harris, an individual whose address is 380 Midway Route, Monticello, Arkansas, was a Director of Nursing for Little Rock Post-Acute and Rehabilitation during the Class Period. The causes of action made the basis of this suit arise out of Defendant Cara Harris' action as the Director of Nursing at Little Rock Post-Acute and Rehabilitation during the Class Period and the clinical operation of the Facility. Defendant Cara Harris was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility. Cara Harris is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Cara Harris is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

22. Defendant Jill Lapaglia, an individual whose address is 3201 Robbins Drive, Bryant, Arkansas, was a Director of Nursing for Little Rock Post-Acute and Rehabilitation during the Class Period. The causes of action made the basis of this suit arise out of Defendant Jill Lapaglia's actions as the Director of Nursing at Little Rock Post-Acute and Rehabilitation during the Class Period and to the clinical operation of the Facility. Defendant Jill Lapaglia was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility. Jill Lapaglia is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of

12

Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Jill Lapaglia is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

23.     Defendant Patricia Cahoone, an individual whose address is 7368 W. Ridge Circle, Sherwood, Arkansas, was a Director of Nursing for Little Rock Post-Acute and Rehabilitation during the Class Period. The causes of action made the basis of this suit arise out of Defendant Patricia Cahoone's actions as the Director of Nursing at Little Rock Post-Acute and Rehabilitation during the Class Period and the clinical operation of the Facility. Defendant Patricia Cahoone designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility.   Patricia Cahoone is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Patricia Cahoone is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

24.     Defendant Cynthia Dughetti, an individual whose address is 10609 Paul Eells Drive #20, North Little Rock, Arkansas, was an Administrator of North Little Rock Health and Rehabilitation Center during the Class Period. Defendant Cynthia Dughetti was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies, procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility. Cynthia Dughetti is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented,

executed and directly participated in the civil conspiracy and common plan and design to chronically understaff North Little Rock Health and Rehabilitation Center. At all times material to this action, Defendant Cynthia Dughetti was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Cynthia Dughetti's conduct forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief. Defendant Cynthia Dughetti is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

25.    Defendant Shantel Mitchell, an individual whose address is 508 Clyde Street, Fordyce, Arkansas, was a Director of Nursing for North Little Rock Health and Rehabilitation Center during the Class Period. The causes of action made the basis of this suit arise out of Defendant Shantel Mitchell's actions as the Director of Nursing at North Little Rock Health and Rehabilitation Center during the Class Period and the clinical operation of the Facility.Defendant Shantel Mitchell was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility.  Shantel Mitchell is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Shantel Mitchell is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

26.    Defendant Amanda Wallace, an individual whose address in, Little Rock, Arkansas, was an Administrator of Capital Health and Rehabilitation Center during the Class Period. Defendant Amanda Wallace was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies,

14

procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility. Amanda Wallace is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff Capital Health and Rehabilitation Center. At all times material to this action, Defendant Amanda Wallace was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Amanda Wallace's conduct forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief. Defendant Amanda Wallace is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

27.     Defendant Angela Tart, an individual whose address is 17 Nevada Lane, Cabot, Arkansas, was an Administrator of Capital Health and Rehabilitation Center during the Class Period. Defendant Angela Tart was designated by the Corporate Defendants to manage and direct the day-to-day functions and overall operations of the Facility, to implement the policies, procedures, and practices developed and required by the Corporate Defendants, and to determine the number of staff at the Facility.  Angela Tart is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Administrator implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff Capital Health and Rehabilitation Center. At all times material to this action, Defendant Angela Tart was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. As the facts alleged herein show, Defendant Angela Tart's conduct

15

forms a significant basis for the claims asserted herein and from whom Plaintiffs seek significant relief. Defendant Angela Tart is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

28.    Defendant Catherine Atlas, an individual whose address is 254 Tanglewood Road, Hot Springs, Arkansas, was a Director of Nursing for Capital Health and Rehabilitation Center during the Class Period. The causes of action made the basis of this suit arise out of Defendant Catherine Atlas's actions as the Director of Nursing at Capital Health and Rehabilitation Center during the Class Period and the clinical operation of the Facility. Defendant Catherine Atlas was designated by the Corporate Defendants to plan, organize, develop, and direct the overall operation of the nursing services at the Facility and to determine the staffing needs at the Facility.  Catherine Atlas is a Defendant from whom significant relief is sought as her conduct, decisions and actions form a significant basis for the claims asserted by the plaintiff class as the Director of Nursing implemented, executed and directly participated in the civil conspiracy and common plan and design to chronically understaff the Facility. Defendant Catherine Atlas is a citizen of the State of Arkansas and subject to the jurisdiction of this Court.

29.    The Defendants collectively and by agreement controlled the operation, planning, and management of the Facilities allowing them to pursue a common plan and design to understaff the Facilities in violation of the residents' statutory and contractual rights. The authority exercised by the Defendants over the Facilities included, but was not limited to, control of marketing, human resources management, training, staffing, creation and implementation of policies and procedures used by the Facilities, federal and state Medicare and Medicaid reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies established by the Defendants.

30.    The Defendants operated as a joint venture/enterprise and pursued a common plan and design to advance their business interests of increasing profits at the expense of the residents, as the Facilities, Skyline Highland Holdings, LLC, JS Highland Holdings, LLC, were owned by and controlled by the same owners, managers, and decision makers, including Joseph Schwartz.

31.    At all relevant times mentioned herein, the Defendants owned, operated and/or controlled the operation of the Facilities, either directly or through the agency of each other and/or other agents, subsidiaries, servants, or employees.

32.    Because the Defendants named herein and others were engaged in a joint venture/enterprise and aided and abetted each other in pursing their common plan and design in carrying out their deceptive business practice of understaffing the Facilities, the acts and omissions of each participant are imputable to all other participants making them jointly and severally liable for all harm caused to the residents. The actions of the Defendants and each of its servants, agents and employees as set forth herein, are imputed to each of the Defendants, jointly and severally.

## JURISDICTION AND VENUE

33.    This Court has jurisdiction over the subject matter and the parties to this action, and venue is proper in this Court.

## BACKGROUND AND FACTUAL ALLEGATIONS

34.    This case arises from Defendants' systemic failure to have sufficient staff at the Facilities to meet the needs of its residents which caused Plaintiffs and the proposed Plaintiff Class to suffer economic and compensatory damages and injuries described in more detail below.

35.    Persons admitted to the Facilities have limitations caused by physical deterioration, cognitive decline, the onset or exacerbation of an acute or chronic illness or condition, or other related factors. They need nursing care, medical treatment, and rehabilitation to maintain

functional status, increase functional status, or live safely from day to day. The residents are elderly, disabled, confined to their beds or unable to rise from a bed or chair independently, and unable to groom, feed, toilet, or clean themselves. Consequently, many nursing home residents rely upon nursing home staff for not only skilled nursing care and treatment, but also essential primary care (herein "Basic Care") including:

a)    Toileting assistance;

b)    Incontinence are and changing of wet and soiled clothing and linen;

c)    Assistance transferring to and from bed and wheelchair;

d)    Assistance with dressing and personal hygiene;

e)    Assistance with bathing;

f)    Assistance with turning and repositioning residents in bed or chair;

g)    Feeding assistance; and

h)    Exercises/passive range of motion ("ROM") exercises.

36.    Defendants limited the number of CNA staff and licensed staff on duty at the Facilities which rendered the Facilities incapable of meeting the needs of the residents. With the limited budgets for staffing, the supply of staffing hours fell far short of the hours needed to adequately care for the residents.

37.    The difference between the services that Defendants were required to provide according to state and federal law and regulations—which Defendants promised to provide in their admissions agreement—and the services that the Facilities were actually capable of providing is profound.

38.     Analysis of survey results reported by the Office of Long Term Care confirm the chronic understaffing at the Facilities and the Defendants inability to provide the Basic Care services for which they were paid.

39.     More specifically, understaffing led to a pattern and practice of failing to provide Basic Care Services at the Facilities to the residents during the Class Period. For example, the Facilities failed to provide adequate staff:

a)      To regularly provide toileting, incontinence care, and basic hygiene care, leaving dependent residents in dirty diapers, dirty clothes, and dirty beds for hours at a time;

b)      To timely respond to call lights rung by residents. Residents were left to soil themselves while waiting for assistance; others fell while attempting to walk to the bathroom unaided;

c)      To re-position bed-bound and immobile residents; many residents remained in the same position for hours at a time, which can and sometimes did result in painful, infection-prone pressure sores;

d)      To undertake ROM exercises – moving their joints and limbs, and assisting vulnerable residents who could walk or exercise. Without this assistance, residents lost mobility, rendering them even less independent.

e)      To wash and bathe dependent residents;

f)      To get dependent residents up, dressed, and out of bed; and

g)      To assist dependent residents with meals. Without help, some residents were unable to eat or drink in the time allotted, and some of them suffered weight loss and dehydration.

40.     These practices confirm that the Facilities did not provide the Basic Care that was required and paid for, and highlight the very human toll of understaffing the Facilities. Defendants' understaffing practices saved them millions of dollars at the expense of the residents' dignity and comfort, and jeopardized their safety. As a result of chronic understaffing, residents at the Facilities were left for long periods in their own urine and waste; were not cleaned, repositioned, or moved,

19

resulting in infections, pressure sores, and loss of mobility; were deprived of food and water; and suffered falls. The failure to provide adequate staff not only violated the law and the contractual terms of the Admission Agreement, it also degraded residents and stripped them of their dignity.

41.    As even more specific proof of the chronic understaffing at the Facilities and the resulting harm to residents, surveys conducted by the Office of Long Term Care establish that the Defendants were on notice and aware of problems with understaffing causing harm to the residents. For example, from April 1, 2016 to present, the Facilities were collectively cited for more than 80 health related deficiencies.

42.    Specifically, Hillview Post-Acute and Rehabilitation Center has been cited for numerous deficiencies during the Class Period evidencing the deceptive business of understaffing their Facilities, including:

      a)    Failure to provide necessary care and services to maintain the highest well-being of each resident:

          i.    October 7, 2016 (scope and severity "J");

          ii.    November 7, 2016 (scope and severity "K");

          iii.    December 16, 2016;

      b)    Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents:

          i.    July 14, 2016 (scope and severity "K");

          ii.    November 7, 2016 (scope and severity "J"); and

      c)    Failure to have a program that investigates, controls, and keeps infection from spreading:

          i.    December 16, 2016.

43.    Similarly, Little Rock Post-Acute and Rehabilitation has been cited for numerous deficiencies during the Class Period evidencing the deceptive business of understaffing their Facilities, including:

  a) Failure to provide necessary care and services to maintain the highest well being of each resident:

    i. October 20, 2016 (scope and severity "J");

    ii. December 2, 2016;

  b) Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents:

    i. April 1, 2016 (scope and severity "K");

    ii. July 28, 2016;

  c) Failure to have a program that investigates, controls, and keeps infection from spreading:

    i. December 2, 2016; and

  d) Failure to assist those residents who need total help with eating/drinking, grooming, and personal and oral hygiene:

    i. June 22, 2016.

44.    North Little Rock Health and Rehabilitation Center has also been cited for numerous deficiencies during the Class Period evidencing the deceptive business of understaffing their Facilities, including:

  a) Failure to provide necessary care and services to maintain the highest well-being of each resident:

    i. October 21, 2016;

  b) Failure to give residents proper treatment to prevent new bed sores or heal existing bed sores:

    i. April 15, 2016;

21

      c)     Failure to have a program that investigates, controls, and keeps infection from spreading:

            i.    April 15, 2016; and

      d)     Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents:

            i.    March 17, 2017.

45.    Capital Health and Rehabilitation Center has also been cited for numerous deficiencies during the Class Period evidencing the deceptive business of understaffing their Facilities, including:

      a)     Failure to provide care for residents in a way that keeps or builds each resident's dignity and respect of individuality:

            i.    June 30, 2016;

      b)     Make sure services provided by the nursing facility meet professional standards of quality:

            i.    April 14, 2016;

      c)     Failure to assist those residents who need total help with eating/drinking, grooming, and personal and oral hygiene:

            i.    February 8, 2017 (scope and severity "K"); and

      d)     Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents:

            i.    April 14, 2016.

46.    Under Arkansas law, the Department of Human Services which licenses nursing facilities to operate, "shall not issue or renew a license of a nursing Facility unless that Facility employs the direct-care staff needed to provide continuous twenty-four-hour nursing care and

service to meet the needs of each resident of the nursing Facility and the staffing standards required by all state and federal regulations." Ark. C. Ann. § 20-10-1402(a).

47.     Under Arkansas law, there are specific staffing standards regarding the minimum number of direct-care staff required in nursing facilities and "the staffing standard required...shall be the minimum number of direct-care staff required by nursing facilities and shall be adjusted upward to meet the care needs of residents." Ark. C. Ann. § 20-10-1402(b)(1). Therefore, a facility which provides staffing at the minimum number of direct-care givers required is not in compliance with Arkansas law as those staffing numbers "shall be adjusted upward to meet the care needs of residents." *Id.* By definition, failure to meet the minimum staffing requirements for direct-care under Arkansas law is also a direct violation of the federal law staffing requirements.

48.     Under Arkansas law for direct-care givers,

>   ...all nursing facilities shall maintain the following minimum direct-care staffing-to-resident ratios:
>
>   (1) One (1) direct-care staff to every six (6) residents for the day shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every forty (40) residents;
>
>   (2) One (1) direct-care staff to every nine (9) residents for the evening shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every forty (40) residents;
>
>   (3) One (1) direct-care staff to every fourteen (14) residents for the night shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every eighty (80) residents.

Ark. C. Ann. § 20-10-1403(a).

## CAUSES OF ACTION AGAINST THE DEFENDANTS

### CLASS CLAIMS

49.     Plaintiffs bring this action individually and in a representative capacity pursuant to Arkansas Rule of Civil Procedure 23 against the Defendants for engaging in a civil conspiracy,

pursuing a common plan and design and acting in concert to create a deceptive business practice of chronically understaffing the Facilities which violated the residents' statutory and contractual rights that unjustly enriched the Defendants. Plaintiffs allege that the Defendants engaged in a deceptive business practice of chronically understaffing the Facilities, breached the Admission Agreement and the Provider Agreement, violated the Arkansas Deceptive Trade Practices Act ("ADTPA"), and violated the Residents' Rights Act. Plaintiffs seek damages for breach of the Admission Agreement and breach of the Provider Agreement; damages under the ADTPA as well as damages for unjust enrichment for receiving payments they were not legally entitled to receive by engaging in the deceptive business practice of understaffing the Facilities and violating state and federal laws, including the Residents' Rights Act on behalf of the named Plaintiffs and all residents and estates of residents who resided at the Facilities from April 1, 2016 to present. Excluded from the class are residents and estates of residents that have sued in the past or currently have lawsuits pending against any of the Defendants, employees of the Defendants, and all employees of the Court in which this case is pending.

50.     From April 1, 2016 to present, the Defendants provided custodial care to more than 400 residents at the Facilities. The class plaintiffs are so numerous that joinder of all individual claims is impracticable.

51.     Upon information and belief, at or near the time of admission to the Facilities, all residents were required to sign the same or substantially the same "Admission Agreement," an example of which is attached, marked as **Exhibit L**.

52.     In the Admission Agreement, the Defendants promised "to furnish ... nursing and personal care, social services, linens, bedding, and other items required for the Resident's known physical condition or by law for the Resident's health, safety, grooming and well-being." Also,

24

Defendants promised "to exercise due diligence to obtain the services of the Resident's personal physician when the Resident's condition requires such medical attention."

53.    The Defendants owed a non-delegable legal duty to the Plaintiffs and Plaintiff Class to provide adequate and appropriate staffing at the Facilities at all times, and Defendants knew that state and federal law, which the Defendants expressly incorporated into their Admission Agreement, required the Defendants to meet critical staffing requirements. These requirements include but are not limited to the following:

a)    Meeting requirements for minimum numbers of Facilities staff members to be present at all times, Ark. Code Ann. § 20-10-1401 et seq.;

b)    Meeting requirements for the minimum number of staff members to be adjusted upward to meet the care needs of residents, Ark. Code. Ann. § 20-10-1401 et seq.;

c)    Meeting additional staffing requirements to assure that all residents receive the highest quality of life while protecting their health and welfare; Ark. Code Ann. § 20-10-1002 et seq.;

d)    Meeting the federal minimum standards imposed by the United States Department of Health and Human Services, 42 CFR Section 405-301 et seq., including providing sufficient nursing staff and nursing personnel to ensure that each resident attains and maintains the highest practical physical, mental, and psychosocial well-being. 42 CFR Section 483.30; and

e)    Meeting the requirements of other provisions of Arkansas and Federal law.

54.    In an effort to ensure that minimum staffing requirements are met, Arkansas law requires that Defendants honestly, accurately, regularly and truthfully:

a)    Post daily personnel sign-in sheets reflecting levels of staffing per shift, Ark. Code Ann. § 20-10-1406; and

b)    Submit to the Office of Long Term Care a written report of all shifts which failed to meet the minimum staffing requirements, Ark. Code Ann. § 20-10-1407.

55.    Defendants filed such reports knowing that they were inaccurate and misleading.

56.    By understaffing the Facilities, Defendants saved significant money and profited at the expense of all residents. Defendants operated and managed the Facilities so as to maximize profits by reducing staffing levels below that which was needed to provide adequate care to residents that would comply with federal and state regulations governing skilled nursing facilities. By understaffing the Facilities, the Defendants did not use money received from Medicare and/or Medicaid they were legally required to use to adequately staff the Facilities to meet the needs of its residents. Thus, Defendants intentionally and/or with reckless disregard for the consequences of their actions caused staffing levels at the Facilities to be set so that the personnel on duty at any given time could not reasonably meet the needs of the residents, causing injury to the residents at the Facilities. The Defendants have created a broad corporate culture in which understaffing is a standard practice and in which Defendants sought reimbursement of funds from government sources for services not provided.

57.    All residents in the Facilities were injured by the Defendants' chronic and institutionalized understaffing. The lack of personnel in the Facilities resulted in residents receiving a level of care (1) that was below the level of care that Defendants represented they were able to provide in their Admission Agreement, and (2) that failed to comply with state and federal minimum staffing requirements.

58.    The pervasive common question is whether the Facilities were chronically understaffed so as to violate the residents' statutory and contractual rights and breached their legal duty to adequately staff the Facilities. There are other questions of law and fact common to the Plaintiff Class which predominate over questions affecting only individual class members. Such common questions include, but are not limited to:

26

a)  Whether the standard Admission Agreement required the Facilities to have sufficient staff to meet the care needs of the residents as required by state and federal laws and regulations;

b)  Whether Ark. Code Ann. §§ 20-10-1201, et. seq., imposes minimum staffing requirements requiring the Facilities to have sufficient staff to meet the care needs of the residents;

c)  Whether Defendants failed to meet the minimum staffing requirements of Ark. Code Ann. §§ 20-10-1201, et seq., and the Defendants' admission agreement by failing to provide sufficient staff to meet the care needs of the residents;

d)  Whether failure to meet the minimum staffing requirements required by state and federal laws and regulations breaches the Defendants' admission agreement, Ark. Code Ann. §20-10-1201, et seq., and the Arkansas Deceptive Trade Practices Act;

e)  Whether chronically understaffing the Facilities in violation of state and federal laws and regulations is a deceptive business practice and/or an unconscionable business practice and/or a violation of the Arkansas Deceptive Trade Practices Act;

f)  Whether the Defendants owed a legal duty to the residents to staff the Facilities in compliance with state and federal laws and regulations;

g)  Whether failure to staff the Facilities in compliance with state and federal laws and regulations is a breach of the provider agreement;

h)  Whether the admission agreement's failure to disclose the Facilities' history of understaffing is an omission or concealment which constitutes a deceptive business practice and/or a violation of the Arkansas Deceptive Trade Practices Act;

i)  Whether the Defendants were unjustly enriched;

j)  Whether the Defendants engaged in a civil conspiracy to understaff the Facilities in violation of state and federal laws and regulations;

k)  Whether the Defendants entered into a conscious agreement to pursue a common plan or design to violate the Residents Rights Act and/or understaff the Facilities;

l)  Whether the Defendants pursued a common plan and design and acted in concert to understaff the Facilities;

m)   Whether the Defendants actions degraded the residents and stripped them of their dignity;

n)   Whether the Defendants were required to use the money they received from Medicare and Medicaid to provide necessary staffing to meet the care needs of the residents;

o)   If so, whether the Defendants used the money received from Medicare and Medicaid to provide adequate staff to meet the care needs of the residents;

p)   Whether the Defendants are required to comply with all state and federal staffing laws and regulations when they received money from Medicare and Medicaid;

q)   Whether the Defendants were in compliance with all state and federal staffing laws when they received money from Medicare and Medicaid;

r)   Whether the Defendants' actions were willful, wanton or demonstrated reckless disregard of the rights of the Plaintiffs; and

s)   Whether Skyline Highland Holdings, LLC; JS Highland Holdings, LLC; and the named individuals are control persons as defined in Ark. Code Ann. 4-88-113(d)(1) and therefore jointly and severally liable for the damages suffered by the Plaintiff Class for the Defendants' deceptive trade practices.

59.    The Plaintiffs will fairly and adequately protect the interest of the Plaintiff Class and have familiarity with the allegations expressed herein and are able to assist in decision making as to the conduct of this litigation.

60.    Plaintiffs' claims are typical of the claims of the class because the class representative's claims arise from the Defendants' standard and routine practice of failing to meet the minimum staffing requirements imposed by state law and their standard admission agreement. The chronic understaffing at the Facilities made it impossible for the few staff who were there to perform their tasks at a level which complied with the protections afforded by the Residents' Rights Act and at the levels promised by the Defendants' Admission Agreement.

28

61.    By understaffing the Facilities, Defendants acted willfully, wantonly and in reckless disregard of the residents' rights intentionally placing profits over people and knowingly taking advantage of residents who were unable to protect their interests because of their physical and mental infirmities. Systemic understaffing of the Facilities directly resulted in undignified living conditions for the residents, a breach of the Admission Agreement, a breach of the provider agreement, a violation of state and federal law, a breach of the Facilities' duties to adequately staff the Facilities, and unjust enrichment of the Defendants. The injuries sustained by the proposed class representative is typical of the class and further evidence understaffing at the Facilities

62.    By understaffing the Facilities, Defendants placed profits over compliance with state law the well-being of the residents. These decisions were made and implemented by the owners, board members, management, employees and agents of Defendants acting in concert and are an illegal, deceptive and unconscionable business practice. Since at least April 1, 2016, the Defendants have, as a standard and routine business practice, violated state and federal laws and regulations in reckless disregard of the Plaintiffs' rights and knowing that the well-being of all residents would be adversely affected as detailed herein.

63.    Defendants failed to discharge their obligations of care to the named Plaintiffs and their loved ones with a conscious and reckless disregard for their individual rights and safety. At all times mentioned herein, Defendants, through their corporate officers and administrators, had knowledge of, ratified and/or otherwise authorized all of the acts and omissions that caused the injuries suffered by the Plaintiff class, as more fully set forth below. Defendants knew that their Facilities could not provide the minimum standard of care to the weak and vulnerable residents of the Facilities.

64.     As a direct and proximate result of the Defendants' conduct, the Plaintiffs and Plaintiff Class have suffered actual damage, both in terms of physical injuries, as detailed above, and damages for loss of dignity, mental anguish and economic damage. Moreover, the Plaintiffs, or someone acting on behalf of the Plaintiffs, provided payment in exchange for services which were not provided, which were not as represented by the Defendants' Admission Agreement, and did not the standards required by the Arkansas Residents' Rights Act.

65.     The Defendants, as the owners, agents, managers and operators of a private organization having the responsibility of protecting and caring for the residents, have direct, vicarious and joint and several liability for the acts and omissions giving rise to this complaint.

66.     Plaintiffs have retained counsel qualified, experienced and able to conduct the litigation, and Plaintiffs have made arrangements to cover the costs associated with this litigation.

67.     If each class member were required to pursue individual actions, it would be economically and judicially unfeasible. A class action is appropriate and the superior method for the fair and efficient adjudication of this controversy.

## COUNT ONE: VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT

68.     Plaintiffs incorporate the allegations contained in Paragraphs 1–67 as if fully set forth herein.

69.     At all times pertinent to this cause of action, Plaintiffs were "elder person[s]" as defined by the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-201(a). As an "elder person" within the meaning of the Deceptive Trade Practices Act, the Plaintiffs have a private cause of action to recover actual damages, punitive damages, and reasonable attorney's fees pursuant to Ark. Code Ann. § 4-88-204.

70.    At all relevant times, the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-107(a) ("ADTPA") provides that it is unlawful to:

    a)    Knowingly take advantage of a consumer who is reasonably unable to protect his or her interest because of:

        i.    Physical infirmity; or

        ii.    A similar factor; and

    b)    Engage in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

71.    Ark. Code Ann. § 4-88-108 provides that, when utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, it shall be unlawful for any person to (1) act, use or employ any deception, fraud or false pretense, or (2) conceal, suppress, or omit any material fact with intent that others rely on the concealment, suppression, or omission.

72.    The conduct of Defendants as described herein constitutes a deceptive practice in violation of the ADTPA. Defendants failed to inform Plaintiffs and the Plaintiff Class in Defendants' standard Admission Agreement that the Facilities routinely failed to meet minimum staffing requirements imposed by state and federal law which increased profits. Furthermore, Defendants represented themselves as providing services commensurate with the needs of the residents and in compliance with the requirements of Arkansas state law governing long-term care and nursing facilities.

73.    By understaffing the Facilities, the Defendants knowingly took advantage of the most vulnerable consumers and those who were unable to protect themselves. Defendants' unfair and deceptive trade practices asserted herein are the type that the ADTPA is specifically designed to protect against and remedy.

31

74.     The Defendants' trade practices also are, and have been throughout the Class Period unconscionable, because the nursing home residents constitute a vulnerable population: they are elderly, ill, infirm, and often deteriorating. These residents often face the double burden of dependency and isolation. The Defendants accept these vulnerable residents for admission, and then knowingly fail to provide sufficient levels of staffing to provide the care required without disclosing in their admission agreement the Facilities' dreadful history of understaffing.

75.     In furtherance of their deceptive business practices, the Defendants: (1) billed and collected money from Medicare and Medicaid representing that they had complied with all laws, including all state and federal staffing laws and regulations, when Defendants knew they had not; (2) did not use the funds received from Medicare and Medicaid to adequately staff the Facilities as they are required to do; and (3) continued to accept residents when they could not care for the residents currently in the Facilities.

76.     The Defendants also engaged in, and have engaged in throughout the Class Period, substantively unconscionable trade practices by understaffing the Facilities making it impossible to provide adequate care to residents even though it charged for services it could not provide.

77.     The Defendants knew that they were not meeting, and did not have sufficient staff to meet the Basic Care needs of their residents as mandated by state and federal laws and regulations.   The Defendants were indifferent to the consequences to the elderly resident population when intentionally understaffing the Facilities to increase profits.

78.     The Defendants further engaged in deceptive trade practices by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201, et seq. ("Protection of Long Term Care Facilities Residents' Act") including, but not limited to, the following:

32

a)   The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

   i.   The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over their general health, safety, and well-being; and

b)   The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

c)   The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

d)   The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

e)   The right to facilities with premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

f)   The right to be free from mental and physical abuse, and from physical and chemical restraints;

g)   The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for their personal needs;

h)   The right to the obligation of the facilities to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

   i.   medical records;

   ii.   personal and social history;

33

    iii.      individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

    iv.      making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facilities record, or cause or procure any of these offenses to be committed; and

    v.      The right to be treated courteously, fairly, and with the fullest measure of dignity.

79.     As described in part and above, the Defendants received repeated citations related to failures of Basic Care in Office of Long Term Care surveys. Upon information and belief, they received these deficiencies despite taking steps to increase staffing and prepare staff for surveys immediately preceding the arrival of state surveyors – steps that would lead surveyors to believe levels of care provided were higher than they actually were during non-survey times.

80.     The conduct of the Defendants, as described herein, constitutes a deceptive practice in violation of the Arkansas Deceptive Trade Practices Act. The Defendants engaged in unconscionable, false, and/or deceptive acts or practices in business, commerce and/or trade including, but not limited to, marketing themselves and holding themselves out to the public as being able to meet the needs of elder residents of the Facilities. The Defendants profited greatly as a result of their deceptive trade practices, but the Defendants were aware that the Facilities could not meet the needs of its residents.

81.     As a direct and proximate result of the Defendants' wrongful, willful and wanton conduct, Plaintiffs have suffered actual damages, including economic damages, compensatory damages and loss of dignity damages.

## COUNT TWO: BREACH OF THE ADMISSION AGREEMENT

82.     Plaintiffs incorporate the allegations contained in paragraphs 1–81 as if fully set forth herein.

83.     Before being admitted to the Facilities, residents, or those acting on their behalf, were required to enter into a resident Admission Agreement, whereby the Facilities agreed to provide nursing and custodial care, necessary goods, services, and/or treatment in exchange for valuable consideration. *See* **Exhibit L**.  Specifically, the Facilities agreed to provide such personal services as may be required for the health, safety, good grooming and well-being of the Residents; dietary services to include three meals per day; blankets, bed linens, towels and washcloths; laundering of linens and towels; and housekeeping services.

84.     The residents, or those acting on their behalf, paid for or caused to be paid for, the goods, services, care and treatment, including personal or custodial care, and professional nursing care the Defendants promised to provide.

85.     The Defendants breached their contractual duties, both express and implied, by understaffing the Facilities and creating a situation whereby it was impossible for caregivers to provide the care and services as described in the agreement, causing damage to the residents, including loss of dignity.

86.     As a result, the Plaintiffs are entitled to compensatory damages, and Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment.

87.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or should have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the Admission Agreement would naturally and probably result in injury

35

or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

## COUNT THREE: BREACH OF THE PROVIDER AGREEMENT

88.     Plaintiffs incorporate the allegations contained in paragraphs 1-87 as if fully set forth herein.

89.     Upon becoming a resident of any of the Facilities, the residents, many of whom were Medicare and/or Medicaid recipients, became third-party beneficiaries of the contract or provider agreement between the Defendants and the state and federal governments, an example of which is attached as **Exhibit M.**

90.     For consideration duly paid by the residents, or on their behalf, the Defendants agreed to provide residents with personal and custodial care and professional nursing care in compliance with the requirements set forth in the provider agreements, as well as the minimum standards of care imposed by applicable law including the statutes and regulations set out herein. In addition, by entering into the agreement, the Defendants promised to "comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State." The Defendants further agreed that "the rights and privileges of the residents [were] of primary concern to the parties" and covenanted to "protect and preserve" the rights of the residents. The parties to the contract agreed "that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement." *See* **Exhibit M.**

91.     As the name implies, the provider agreement exists to pay for and provide for resident, personal, or custodial care and professional nursing care. Additionally, the provider

agreement between the Defendants and the state and federal government was clearly intended to

benefit and protect the residents of the Facilities by requiring the Defendants to provide quality

care consistent with federal and state statutes and regulations.

92.     The Defendants breached the provider agreement and committed multiple acts of

nonfeasance in failing to adequately staff the Facilities and provide the care, goods, and services

to industry standards, as required by law and as agreed, including but not limited to:

a)      Failing to provide dietary services, including special diets, supplemental feedings, special delivery preparation, assistance, and equipment required for preparing and dispensing oral feedings and special feeding devices;

b)      Failing to provide personal or custodial services and nursing care;

c)      Failing to implement policies and procedures so as to prevent infringement or deprivation of the Plaintiff Class's rights as residents of long term care facilities;

d)      Failing to comply with protections, duties and obligations imposed by applicable state and federal statutes and regulations as alleged herein; and

e)      Failing to staff the Facilities with sufficient personnel to adequately meet the needs of the Plaintiff Class, failing to comply with the rules and regulations promulgated by the state and federal governments, and in failing to provide staff qualified to meet the needs of the residents.

93.     As a result of the Defendants' breach of the provider agreement, Plaintiffs assert a

claim for judgment for all compensatory damages including the amount a jury determines is

sufficient compensation for the loss of the benefit of promised services and care and treatment.

94.     The Defendants are also liable for all consequential damages, because the

Defendants knew, or should have known, that breaches of the provider agreement would result in

consequential damages to the Plaintiff Class, and, under the circumstances, the Defendants should

have understood that it had agreed to assume responsibility for any consequential damages caused by their breaches of the provider agreement.

95.     Plaintiffs seek judgment for all foreseeable consequential damages, which flowed naturally from the failure of the Defendants to provide the care, goods, and services promised under the provider agreement, including but not limited to mental anguish and loss of dignity.

96.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the provider agreement would naturally and probably result in injury or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

97.     A copy of the provider agreement is attached to this Complaint as **Exhibit M.**

### COUNT FOUR:  CIVIL CONSPIRACY/ACTING IN CONCERT

98.     Plaintiff incorporates the allegations contained in Paragraphs 1–97 as if fully set forth herein.

99.     The Facilities entered into various agreements, including but not limited to, consulting, administrative, property, clinical and other agreements with the Defendants, which were implemented and carried out by the Defendants in Arkansas as part of a common and integrated plan and design, whereby they conspired to understaff the Facilities in violation of state and federal laws and regulations for profit at the expense of the residents.

100.     In furtherance of their civil conspiracy and common plan and design of deceptive business practices, the Defendants billed and collected money from Medicare and Medicaid representing that they complied with all laws, including state and federal staffing laws and regulations, and which funds were required to be used to staff the Facilities to provide adequate

38

care for the residents. Instead of using these funds to provide adequate care to the residents, the money was siphoned out of the Facilities pursuant to agreements between and among the Defendants for the benefit of the Defendants and the owners.

101.    The Defendants concealed the history of chronic understaffing at the Facilities from the residents in furtherance of their common plan, design and deceptive business practice to understaff the Facilities and recruit new residents and engaged in other acts which were improper as discussed herein and conducted in furtherance of their common plan and design to understaff the Facilities in violation of state and federal laws and regulations for profit at the expense of the residents.

102.    The actions taken by the Defendants in furtherance of this common plan and design were unlawful, oppressive, deceptive and immoral in chronically understaffing the Facilities in violation of the Residents' Rights Act and the Arkansas Deceptive Trade Practices Act and carried out against the elderly and infirm. These actions justify relief under the doctrine of unjust enrichment as the Defendants received money they were not legally entitled to receive and should not be permitted to retain.

103.    As a direct and proximate result of the actions taken by the Defendants taken in furtherance of this common plan and design, the Plaintiff and the Plaintiff Class were harmed. The Defendants are jointly and severally liable for all compensatory and punitive damages against the Defendants including, but not limited to, economic damages and damages for loss of dignity to be determined by the jury, plus costs and all other relief to which Plaintiffs are entitled by law.

## COUNT FIVE:  UNJUST ENRICHMENT

104.    Plaintiff incorporates the allegations contained in Paragraphs 1–103 as if fully set forth herein.

105.    In violation of the Residents' Rights Act, the Arkansas Deceptive Trade Practices Act and other state and federal laws, the Defendants conspired to understaff the Facilities and received payments from residents and payments made on behalf of residents which they were not entitled to receive. The Defendants were unjustly enriched by receiving money which they were not legally entitled to receive and should not be permitted to retain.

106.    The Defendants should not be permitted to unjustly enrich themselves at the expense of the Plaintiff and Plaintiff Class. Equity and good conscience requires the Defendants to make restitution and/or be disgorged of all funds received in violation of state and federal laws and regulations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and on behalf of the Plaintiff Class prays for judgment against Defendants as follows:

a)    For damages, including economic, compensatory, mental anguish and loss of dignity, in an amount adequate to compensate the Plaintiffs for the injuries and damages sustained.

b)    For all actual, general and special damages caused by the alleged conduct of Defendants.

c)    For the costs of litigating this case.

d)    For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204 and 113(f).

e)    For punitive damages sufficient to punish Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences the residents and to deter Defendants and others from repeating such atrocities.

40

f)    Enjoining the Defendants from: (i) understaffing the Facilities; (ii) accepting residents at a time the Facilities are understaffed; (iii) accepting payments from any source, including Medicare and Medicaid, at any time in which the Facilities are not in full compliance with all state and federal laws and regulations; and (iv) billing for services not provided.

g)    For all other relief to which Plaintiffs are entitled.


Respectfully submitted,

The Plaintiffs and all others similarly situated

By:

Brian D. Reddick (94057)
Brent L. Moss (95075)
Robert W. Francis (2007032)
Daniel K. Yim (2014202)
**Reddick Moss, PLLC**
One Information Way, Suite 105
Little Rock, Arkansas 72202
Telephone:    (501) 907-7790
Facsimile:    (501) 907-7793

and

H. Gregory Campbell (92001)
**Campbell Law Firm, P.A.**
One Information Way, Suite 110
Little Rock, AR 72202
Telephone:    (501) 372-5659
Facsimile:    (501) 374-8657

**DURABLE POWER OF ATTORNEY**

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25 15:30:26
60CV-17-3863
C06D12 : 5 Pages

KNOW ALL MEN BY THESE PRESENTS, that I, _Kesha McBraver_ (NAME) residing at,

_9400 Stagecoach Rd_ (ADDRESS), do hereby appoint _Mercedes Omkson Perry_ (NAME)
_Apt 411, Little Rock AR 72210_

residing at _0322 18th St. No. 1 Lubbock_ (ADDRESS) my true and lawful attorney, in fact, for me and
_TX 79423_

in my name, place, and stead, and for my use and benefit:

To demand, sue for, recover, collect, and receive all sums of money, debts, accounts, legacies, bequests, interest, dividends, annuities, and demands whatsoever as are now or shall hereafter become due, owing, payable, or belonging to me and have, use, and take all lawful means for the recovery thereof, and to compromise and give discharges for the same;

For me and in my name, to make, deliver, bargain, sell, contract, agree for, purchase, receive, and take any and all legal actions with respect to my financial affairs and/or personal property and/or real property including but not limited to the endorsement of checks, drafts, notes, bills of sale, titles and any other commercial paper in my name and to withdraw money from any of my checking and/or savings accounts and to sign orders or receipts thereof in my name and to convey and/or transfer title to any of my motor vehicles.

Giving and granting unto said attorney-in-fact full power and authority to do and perform every act and thing necessary, to be done in and about relative to any of the foregoing as fully as I might or could do if personally present.

All power and authority granted herein shall not be affected by my disability, incapacity, or adjudged incompetency.

IN WITNESS WHEREOF, I have hereunto signed my name this _5_ day of _January_, 20_15_

_____
Granter

_____       _____
Witness   LLAMS D LCSW              Witness

Acknowledgment

State of_____)

County of_____)

Before me, a notary public in and for said County and State, personally appeared the above-named who acknowledged that he did sign the foregoing instrument and that the same is free and voluntary act and deed.

In testimony whereof, I have hereunto set my hand and official seal this _5_ day of _January_, 20_15_

_____
Notary Public   1/5/15  2:37 PM        **Warning:**

**These forms are provided AS IS. They are not intended to ~~replace~~ the advice of your attorney and may not be legally binding in all situations or jurisdictions. They are for informational purposes only.**

**EXHIBIT**

**A**



## Instructions For Using This Document

This document includes a Living Will. Healthcare Proxy and Optional Organ and Tissue Donation form. You can fill out any or all of the forms. Make any changes you want. Then sign in front of two witnesses. If you want the Living Will. Healthcare Proxy and Optional Organ and Tissue Donation you must sign this document in three places. The document does not have to be notarized.

### *Living Will Declaration*

By
Kesha McBrayer
*(Name of person signing document)*

If I am terminally ill or permanently unconscious, and I am not able to make decisions about my medical treatment, I direct my physician to withhold or withdraw treatment that prolongs the process of my dying and is not necessary to my comfort. Specifically, if I am terminally ill or permanently unconscious. I direct my physician to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain. This includes:

- ☐ antibiotics          ☐ breathing machine
- ☐ surgery             ☐ CPR
- ☐ blood products      ☐ kidney dialysis
- ☐ nutrition/hydration

This document is intended to be a Living Will under the Arkansas Rights of the Terminally III or Permanently Unconscious Act.

Signed this ___5___ day of ___Jan___ , 20_15_

_____
*Signature of person*

---

### Witnesses

The declarant voluntarily signed this writing in my presence.

_____Jenay Stafford_____         _____Pamela Crause RNM_____
*Signature of Witness*                      *Signature of Witness*
CLAP/MS                                        UAMS/4301 W. Markham L.R. AR 72205
4301 W. Markham                        *Address*
*Address*  SER Dr.  72205
_____1/5/15_____                         _____01/5/2015_____
*Date*                                           *Date*

Revised 4/05

## *Healthcare Proxy*

Anytime I am temporarily or permanently unable to make healthcare decisions, my healthcare proxy shall be:

Mercedes Anderson Berry

*(Name of person)*

My healthcare proxy may make all decisions about:
- My personal care
- My medical care
- Hospitalization
- Whether I shall receive medical treatment or procedures including artificial feeding or fluids, even though I may die
- Visitors, if problems arise concerning visits by friends and family

Such decisions shall be consistent with my wishes, or, if my wishes are unknown, shall be consistent with my best interest.

This document is intended to be a durable power of attorney under A.C.A. 20-13-104 and a declaration and proxy statement under the Rights of the Terminally Ill or Permanently Unconscious Act.

You may add further instructions here:

_____

_____

_____

Signed this __5__ day of __Jan__ , 20 __15__

_____
*Signature of person*

## *Witnesses*
The declarant voluntarily signed this writing in my presence.

Virae Stafford LCSW                    Pamela House RN CNM
*Signature of Witness*                  *Signature of Witness*

UAMS                                    UAMS 4301 W. Markham LR, AR 72205
4301 W. Markham                         *Address*
*Address*
LR AZ 72205                             01/5/2015
1/5/15                                  *Date*
*Date*

Revised 4/05

(Place MR Label Here)
MR#:
Patient's Name:
Patient's Address:

**UAMS
MEDICAL
CENTER**
UNIVERSITY OF ARKANSAS
FOR MEDICAL SCIENCES

## *Authorization for Release of Information from UAMS*

1. I, Keshia McBrayer , hereby authorize UAMS to release to:
   Name Mercedes Anderson Berry Phone 501 940-6522 Fax
   Complete Address 2322 78th St. No. 1          Lubbock      TX    79423
                   _Street Address_                _City_          _State_      _Zip_

2. Information of:
   Patient name _____ Medical Record # (if known)_____
   Birthdate and / or Soc Sec No._____ Patient phone _____

3. Information is to be limited to the following Dates of Treatment (if applicable): _____

4. Information requested to be accessed or released: ___ Abstract ___ Operative Report ___ ER Record
   ___ History & Physical ___ Clinic Record ___ Discharge Summary ___ Admission Record
   ___ Physicians' Progress Notes ___ Nurses' Progress Notes ___ Other_____

   ___ Records of Other Providers On File With UAMS (if any). *(We must impose our standard copying fees
   as stated below. UAMS does not represent that these records are the complete records of the other
   providers. If you want a complete copy of the records created by the other providers for this patient,
   you may wish to contact each provider.)*

   **I understand that if the records requested to be released include information relating to sexually transmitted
   disease, AIDS or HIV, alcohol or drug abuse, or mental health information, including records from the
   UAMS Psychiatric Research Institute, this information may be released pursuant to this authorization.**

5. ___ Billing Records. For hospital billing records, please contact Patient Business Services (PBS)
   at (501) 614-2888. For physician billing records, please contact Medical College Physicians
   Group (MCPG) at (501) 614-2160, or 1-800-559-6274.

6. Purpose of release is at the request of the patient or: ___ Insurance or Other Payment
   ___ Medical Care ___ Other (explain): _____

7. This authorization will expire 90 days from the date on which it was signed unless I specify a different time period
   Expiration Date or Event: _____. I understand that I may revoke this authorization at any time by
   giving written notice to UAMS. A revocation of this authorization will not apply to records already released in
   reliance upon the authorization. A photocopy of this signed authorization shall constitute a valid authorization.

8. UAMS, its employees and attending physicians are released from legal responsibility or liability for the release
   of above information to the extent indicated and authorized herein.

9. I understand that once the above information is disclosed, it may be re-disclosed by the designated recipient and
   the information may no longer be protected by federal privacy laws and regulations.

10. I agree to pay the copying cost, including other expenses allowed by law, such as the cost of any supplies, labor
    of copying, postage, or other expense incurred by UAMS to provide the copies requested.

11. UAMS will not condition treatment, payment, enrollment or eligibility for benefits on your signing of this
    authorization.

Signature of Patient
or Legal Representative X_____ Date/Time Jan 5 2018   1440

If Legal Representative, authority of Legal Representative _____
*( such as parent of minor, court-appointed guardian, administrator of estate of deceased, attorney-in-fact appointed with power of attorney, or healthcare proxy)*

### Provide a copy to Patient/Legal Representative
UAMS
4301 West Markham, Slot 524
Little Rock, AR 72205
Fax: 501-686-8361

Med Rec 99 FR (04/10)
Authorization for ROI

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25 15:30:26
60CV-17-3863
C06D12 : 5 Pages

## DURABLE POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

THAT I, FELIX RAY WILLIAMS, of North Little Rock, Arkansas, by these presents do make, constitute and appoint JAMES EDWARD GREEN ( Brother ), of Jacksonville, Arkansas, as my true and lawful attorney in fact (hereinafter "Attorney"), to perform the following acts, duties and powers, giving and granting unto my Attorney full and complete power and authority in the premises to do, say, act, transact and perform each, all and every act, thing and deed whatsoever pertinent thereto, requisite and necessary to be done, said, transacted and performed in and about the premises, or related to the purposes and powers hereinafter set out and granted, as fully to all intents and purposes as I might or could do if personally present and acting in my own behalf, to-wit:

1. **General Grant of Power.** My Attorney shall have full power to act for me and in my name in all matters and to do all things that I could do if personally present and acting in my own behalf.

2. **Specific Powers.** The general grant of power shall include, but not be limited to, the following powers:

(a) **Collection.** To demand, forgive, sue for, recover, collect, settle, extend or compromise any debt or claim payable to me with respect to money, commercial paper, notes, checks, drafts, accounts, deposits, certificates of deposit, tax and other refunds, securities, dividends, interest, rents, annuities, insurance proceeds, pensions, profit sharing payments, retirement benefits, social security payments, Medicare and Medicaid payments, inheritances, documents of title and all other property (real or personal) and obligations in which at any time I have any interest.

(b) **Payment.** To pay, compromise, renew or settle any debt, claim or liability due from me.

(c) **Banking.** To sign, endorse, receive, guarantee and stop payment on checks, drafts, notes, and other instruments for the payment of money; to open or close accounts, and to deposit and withdraw money, purchase and redeem savings bonds, certificates of deposit and other time deposits, whether held solely or jointly, in banks, savings and loan associations and other institutions.

(d) **Borrowing.** To obtain credit, borrow money or renew existing loans from any source; to pledge, mortgage or assign any property as collateral and execute instruments necessary to do so.

(e) **Purchase and Sale.** To purchase, acquire, lease, exchange, sell and transfer any property, real or personal, tangible or intangible, including United States Treasury

EXHIBIT
B

bonds redeemable at par to pay federal estate taxes and other obligations of the United States, commodities, options, stocks, bonds and other securities; to borrow in connection with any purchase; to purchase on margin.

(f) **Property Management.** To manage, sell, lease, occupy, possess, insure, repair, improve, subdivide, raze, grant easements, and execute land trust agreements, deeds and other instruments (including instruments containing warranties and releasing rights of homestead) necessary to convey title in connection with any property, real or personal, tangible or intangible, in which at any time I have any interest, solely or jointly.

(g) **Stock Voting.** To vote stock in person or by proxy, and to delegate discretionary powers to proxies.

(h) **Existing Contracts.** To perform any agreement entered into by me.

(I) **Litigation.** To institute, compromise, settle, defend, and appear in, appeal, give bond in and engage counsel to represent me in all legal proceedings in which at any time I may have any interest. However My Attorney shall have no power to enter into any pre-dispute arbitration agreement.

(j) **Business.** To invest in, continue or wind up any business interest; to execute and amend partnership agreements; to incorporate, reorganize, merge, consolidate, recapitalize, sell, liquidate or dissolve any business; to elect, employ and compensate directors, officers, employees and agents; to execute buy-sell and voting trust agreements; to exercise options and subscription rights.

(k) **Entry to Safe Deposit Box.** To enter (including authority to drill) and remove property of mine from, or terminate the lease of, any safe deposit box held in my name, solely or jointly.

(l) **Tax Matters.** To prepare, sign and file, or receive copies of any income tax returns, gift tax returns, estimates, waivers, consents, protests, receipts, refund claims, requests for filings, agreements and petitions (including petitions to the Tax Court of the United States); to represent me and to hire counsel to represent me before any governmental agency or court.

(m) **Agents.** To hire and dismiss agents, with the same or more limited powers, to act for my Attorney.

(n) **Medical Care.** To arrange for my medical, surgical, hospital, nursing and convalescent care and treatment, including consent to treatment and application for insurance and other benefit payments related thereto.

2

(o) **Insurance.**  To purchase, make loans on, pledge, convert or cancel any insurance in any amount on my life or any property interests I may have at any time; to receive any payments due on cancellation.  Despite any other provision of this instrument my Attorney shall have no power to exercise any incident of ownership I have over any insurance policy on my Attorney's life.

(p) **Gifts.**  To carry on any gift program, charitable or otherwise, in which I am engaged.

(q) **Fiduciary Powers.**  To exercise any powers given to me in a fiduciary capacity, whether solely or jointly, under any trust instrument, will or other instrument to the extent I may delegate the powers; to execute a trust instrument with dispositive provisions identical to any existing will or trust (or both) of mine at the time of execution; to exercise all powers which I have as the settlor or beneficiary of any trust, including the power to amend, revoke, disclaim, and transfer assets to the trust; provided, however, that under no circumstances shall my Attorney have any authority or power whatsoever to execute, amend, alter or revoke any will or codicil of mine or on my behalf.

(r) **Receipts.**  To execute all instruments in connection with the above granted powers or for the protection of parties dealing with my Attorney, including receipts, releases, discharges and indemnifications.

(s) **Retirement Plan Elections.**  To elect, pursuant to the terms of any employee benefit plan, individual retirement plan or insurance contract, the mode of distribution of the proceeds thereof.

(t) **Additional Powers.**  In addition to all the foregoing general and specific powers, and not in limitation thereof, my Attorney is further hereby authorized to exercise and is granted any inherent and implied powers and those powers as stated in Act 153 of the 1961 General Assembly of the State of Arkansas, codified at Ark. Code Ann. 28-69-304, as now or hereafter amended, the provisions of which are incorporated herein by this reference as though set out word for word.  In the event that there should be a conflict between the specific powers provided herein and those powers stated in said Act, then this instrument shall be interpreted in favor of granting the less restrictive of such conflicting powers to my Attorney.

3.  **Not Affected By Disability or Incapacity.**  This power of attorney shall not be affected by my subsequent disability or incapacity and shall be a durable power of attorney within the meaning of and in accordance with Act 659 of the 1981 General Assembly of the State of Arkansas, codified at Ark. Code Ann. 28-68-201 et seq., as now or hereafter amended.

4.  **Guardian.**  If protective proceedings for the appointment of a guardian of my person or estate are commenced at any time subsequent to my execution of this power of attorney, then I hereby nominate for appointment as such guardian my Attorney, and to the extent allowed by

3

law direct that my Attorney shall serve without bond. I make this nomination pursuant to my right to do so as provided in Ark. Code Ann. 28-68-203.

5. **Governing Law.** The law of Arkansas shall govern this instrument.

6. **Ratification.** I authorize any person or institution presented with this power of attorney to honor it without inquiry and to give effect to all documents signed by my Attorney on my behalf. My Attorney's representation that my Attorney is acting according to this instrument shall fully protect anyone dealing with my Attorney. I hereby, for myself, my heirs, executors and administrators, ratify and confirm whatever my Attorney may do under this instrument.

7. **Specimen Signature.** The following is a specimen of the signature of my Attorney:

IN WITNESS WHEREOF, I have signed this instrument on this _19_ day of February, 2016.

We, the undersigned, do hereby certify that the Declarant, FELIX RAY WILLIAMS subscribed this Durable Power of Attorney in our presence, and in his presence, and in the presence of each other, signed as attesting witnesses.

Witness

Address    7/3 N. Hickory

City, State and ZIP Code

Witness

Address    10109 Godwin Dr.

City, State and ZIP Code    L. R. Ark. 72204

4

## ACKNOWLEDGMENT

STATE OF ARKANSAS

COUNTY OF PULASKI


On this day before me, the undersigned officer, personally appeared, FELIX RAY WILLIAMS, to me personally well known, who acknowledged that said person had freely and voluntarily subscribed their name to the foregoing instrument and had executed the same for the consideration and purposes therein contained.

**WITNESS** my hand and official seal this ⅃⅁ day of February, 2016.


Notary Public

My Commission Expires

DIETERICK L. GOVAN
MY COMMISSION # 12382144
EXPIRES: June 17, 2021
Pulaski County

5

ELECTRONICALLY FILED
Pulaski County Circuit Court
ELECTRONICALLY FILEDlerk
Pulaski County Circuit Court0:26
Larry Crane, Circuit/County Clerk
2017-Jul-25 10:22:10
60PR-17-1466
C06D03 : 3 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
FELIX WILLIAMS, DECEASED                         NO. 60PR - 17 - 1466

---

### ORDER APPOINTING SPECIAL ADMINISTRATOR

---

The Petition of James Green for appointment of a special administrator of the Estate of Felix Williams, deceased, is presented to the Court.   Upon consideration of the Petition and the facts and evidence in support of it, the Court finds:

1.     That no demand for notice of proceedings for the appointment of a special administrator of the Estate has been filed.   The Petition is not opposed by any known person, and it may be heard without notice.

2.     That decedent, Felix Williams, aged 60, who resided in Pulaski County, Arkansas, died intestate on or about July 18, 2017.

3.     That this Court has jurisdiction of this proceeding and venue properly lies in this County.

4.     That James Green is a proper person by law to serve as special administrator of the estate.

5.     That it appears there are no unsecured claims against the decedent's estate.

6.     That the Estate has no assets other than a potential personal injury/wrongful death action, and bond, therefore, is waived at this time.   The Court will revisit the issue of bond should the Estate acquire assets at any time.



EXHIBIT
C

**IT IS THEREFORE ORDERED** as follows:

a.     The special administration of the Estate is opened;

b.     James Green is appointed special administrator of the Estate for the limited purpose of investigating and bringing forth a personal injury/wrongful death action on behalf of the Estate and the wrongful death beneficiaries of the decedent, to serve without bond;

c.     Letters of Special Administration shall be issued to this special administrator without the requirement of a bond; and

d.     Upon termination of the duties set forth above, James Green shall immediately make a full and complete report of his actions and the condition and affairs of the Estate to this court.

DATED this _____ day of _____, 2017.


_____
**CIRCUIT JUDGE**


Submitted by:

_____
H. Gregory Campbell (#92001)
**CAMPBELL LAW FIRM, P.A.**
One Information Way, Suite 110
Little Rock, Arkansas 72202
Telephone No. (501) 372-5659
Attorneys for Estate

–2–



Arkansas Judiciary

**Case Title:**     FELLIX WILLIAMS

**Case Number:**    60PR-17-1466

**Type:**           ORDER APPT ADMINISTRATOR/IX

So Ordered

Judge Compton

Electronically signed by JBMEACHAM on 2017-07-25 10:27:15    page 3 of 3

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25  15:30:26
60CV-17-3863
C06D12 : 4 Pages

# <u>DURABLE GENERAL POWER OF ATTORNEY</u>
# <u>WITH HEALTH CARE POWERS</u>

**STATE OF ARKANSAS**                  )

                                                          ) ss.

**COUNTY OF** Lonoke                 )

**KNOW ALL MEN BY THESE PRESENTS:**

That I, **Abraham Woodard**, of the City of *England*, County of *Lonoke*, State of Arkansas, constitute and appoint **Brenda Woodard**, my true and lawful attorney-in-fact for me and in my name, place and stead, and on my behalf, and for my use and benefit to:

1.      Exercise or perform any act, power, duty, right or obligation whatsoever that I now have, or may hereafter acquire the legal right, power or capacity to exercise or perform, in connection with, arising from, or relating to any person, item, tangible or intangible, or matter whatsoever;

2.      Request, ask, demand, sue for, recover, collect, receive, and hold and possess all such sums of money, debts, dues, commercial paper, checks, drafts, accounts, deposits, legacies, bequests, devises, notes, interests, stock certificates, bonds, dividends, certificates of deposit, annuities, pension and retirement benefits, insurance benefits and proceeds, any and all documents of title, chose in action, personal and real property, intangible and tangible property and property rights, and demands whatsoever, liquidated or unliquidated, as now are, or shall hereafter become, owned by, or due, owing, payable or belonging to me or in which I have or may hereafter acquire interest, to have, use and take all lawful means and equitable and legal remedies, procedures, and writs in my name for the collection and recovery thereof, and to adjust, sell, compromise, and agree for the same, and to make, execute, and deliver for me, on my behalf and in my name, all endorsements, acquittanced, releases, receipts or other sufficient discharges for same;

3.      To lease, purchase, exchange and acquire, and to agree, bargain and contract for the lease, purchase, exchange and acquisition of, and to accept, take, receive, and possess real or personal property whatsoever, tangible or intangible, or interest thereon, on such terms and conditions, and under such covenants, as said attorney-in-fact shall deem proper;

4.      To maintain, repair, improve, manage, insure, rent, lease, sell, convey, subject to liens, mortgages, subject to deeds of trust, and hypothecate, and in any way or manner deal with all or any part of any real or personal property whatsoever, tangible or intangible, or any interest therein, that I now own or may hereafter acquire, for me, in my behalf, and in my name and under such terms and conditions, and under such covenants, as said attorney-in-fact shall deem proper;

Page 1



5.    To conduct, engage in, and transact any and all lawful business of whatever nature or kind for me, on my behalf, and in my name;

6.    To administer any individual retirement accounts owned by me, and withdraw any money from such individual retirement plans as may be needed for my health, comfort, and welfare.

7.    To execute and deliver deeds, assignments, or other documents necessary to establish or transfer assets to the Trustee of any living trust, existing (or newly established) to provide for myself and my spouse with my children as equal remaindermen, per stirpes.

8.    To make, receive, sign, endorse, execute, acknowledge, deliver and possess such applications, contracts, agreements, options, covenants, conveyances, deeds, trust deeds, security agreements, bills of sale, leases, mortgages, assignments, insurance policies, bills of lading, warehouse receipts, documents of title, bills, bonds, debentures, checks, drafts, bills of exchange, letters of credit, notes, stock certificates, proxies, warrants, commercial paper, receipts, withdrawal receipts and deposit instruments relating to accounts or deposits in, or certificates of deposit of, banks, savings and loan or other institutions or associations, proofs of loss, evidences of debts, releases, and satisfaction of mortgages, liens, judgments, security agreements and other debts and obligations and such other instruments in writing of whatever kind and nature as may be necessary or proper in the exercise of the rights and powers herein granted.

9.    To make decisions for me regarding my health care. In exercising this authority, my attorney-in-fact shall follow my desires as known to my attorney-in-fact. In making any decisions, my attorney-in-fact shall attempt to discuss the proposed decision with me to determine my desires if I am able to communicate in any way. If my attorney-in-fact cannot determine the choice I would want made, then he shall make a choice for me based upon what my attorney-in-fact believes to be in my best interests. This power to make health care decisions shall include but not be limited to the power to consent, refuse or withdraw consent to any and all types of medical care, treatment and procedures; to have access to and the right to disclose to others my medical records and information; to authorize my admission to or discharge from any hospital, nursing home, residential care facility or the like; to contract on my behalf for any health care related service or facility, without incurring personal financial liability on such contracts; to hire and fire medical, social service, and other support personnel responsible for my care; and to take any other action necessary to do what I authorize here, including granting any waiver or release from liability required by any hospital, physician, or other health care provider; signing any documents relating to refusals of treatment or the leaving of a facility against medical advice, and pursuing any legal action in my name and at the expense of my estate to force compliance with my wishes as determined by my attorney-in-fact.

10.    To make gifts (outright, in trust or otherwise) to himself or herself, individually, or to my children, their spouses and their descendants (and to the spouses of my descendants). It is my expectation that any such gifts shall be made only to the extent that such gifts will be eligible for the annual gift tax exclusion provided in Section 2503(b) of the Internal Revenue

Page 2

Code of 1986, as amended. I recognize, however, that there may be circumstances in which it is desirable for estate planning purposes to make gifts in an amount that exceeds the present annual exclusion, and I direct my attorney-in-fact, subject to other limitations set forth herein, to make gifts in amounts that exceed the exclusion provided for in Section 2503(b) of the Code, after balancing my needs with the estate planning opportunities available to my estate. However, when a child of mine, his or her spouse, or other descendant of mine is acting as my attorney-in-fact hereunder, gifts to himself or herself in an individual capacity (or to his or her estate, creditors or creditors of his or her estate) shall be limited to the greater of $5,000 per year or 5% of the aggregate value of the assets subject to this power.

11.    I grant to said attorney-in-fact full power and authority to do, take and perform all and every act and thing whatsoever requisite, proper, or necessary to be done, in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as I might or could do if personally present, with full power of substitution of revocation, hereby ratifying and confirming all that said attorney-in-fact, or his substitute or substitutes, may lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted. Provided, however, any authority granted to my attorney-in-fact shall be limited so as to prevent this power of attorney (1) from causing my attorney-in-fact to be taxed on my income, and (2) from causing my estate to be subject to a general power of appointment (as that term is defined in Section 2041 of the Internal Revenue Code of 1986, as amended) by my attorney-in-fact.

12.    This instrument is to be construed and interpreted as a general durable power of attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it limit or restrict, and is not to be construed or interpreted as limited or restricting, the general powers herein granted to said attorney-in-fact.

13.    This Power of Attorney revokes any previous Powers of Attorney granted by me and shall remain effective unless revoked in writing by me.

14.    This Instrument may be filed of record in such counties within and without the State of Arkansas as may be appropriate by the Attorney, and copies of this instrument certified as "true" copies by the Circuit Clerk and Ex-Officio Recorder of any of the counties shall be treated as original copies for all purposes.

15.    The rights, powers, and authority of said attorney-in-fact herein granted shall commence and be in full force and effect on _____ day of July, 2017, and such rights, powers and authority shall remain in full force and effect thereafter until terminated by written notice. This power of attorney shall not be affected by subsequent disability or incapacity of the principal.

DATED: ___day of July, 2017.

Page 3

_Abraham Woodard_

**ABRAHAM WOODARD**
SS # 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
DOB: 12-18-63

## ACKNOWLEDGMENT

STATE OF ARKANSAS        )
                         ) ss.
COUNTY OF _Pulaski_      )

On this _11th_ day of _July_, 2017, before me, the undersigned, a Notary Public within and for the County and State aforesaid, duly commissioned and acting personally appeared _Abraham Woodard_ known to me to be the person whose name is subscribed to the above and foregoing General Durable Power of Attorney and acknowledged that he had executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have set my hand and official seal.

RENITA BROWN
Notary Public-Arkansas
Pulaski County
My Commission Expires 07-25-2026
Commission # 12698196

NOTARY PUBLIC

_Renita Brown_

My Commission Expires: 7-25-26

Page 4

7/25/2017                          Arkansas Secretary of State

ELECTRONICALLY FILED
2017
60CV-17-88
C06D12 : 1 Page

ARKANSAS
SECRETARY OF STATE
*Mark Martin*

## Search Incorporations, Cooperatives, Banks and Insurance Companies

Printer Friendly Version

LLC Member information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | JS HIGHLAND HOLDINGS, LLC |
| Fictitious Names | |
| Filing # | 811096480 |
| Filing Type | Limited Liability Company |
| Filed under Act | Domestic LLC; 1003 of 1993 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | HEARTSILL RAGON III |
| Agent Address | 425 W. CAPITOL AVE STE 3800 |
| | LITTLE ROCK, AR 72201 |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

**Purchase a Certificate of Good**     **Pay Franchise Tax for this corporation**
**Standing for this Entity**



EXHIBIT
*E*

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25  15:30:26
60CV-17-3863
C06D02 : 22 Pages

## Hillview Post Acute and Rehabilitation Center

Telephone:  (501) 224-2700                                          FAX Number: (501) 301-7629

### I.  FACILITY DATA

Updated:  #########

| | |
|---|---|
| **MAILING ADDRESS** | **Administrator:** Mishana Jackson |
| | **Admininistrator License Number:** 1778 |
| 8701 Riley Drive | **Total Licensed Beds:** 140 |
| Little Rock, AR 72205 | |
| | **Life Safety Code Years:** 1973 |
| **PHYSICAL LOCATION** | |
| | |
| 8701 Riley Drive | **Certification:** Title XIX/XVIII |
| Little Rock, AR 72205 | |
| County: Pulaski-East  #60-4 | |

| **Facility Identification Numbers** | **Certified Beds:** 140 | | **Classification** | |
|---|---|---|---|---|
| | Medicaid: | 0 | NF: | |
| **Federal Provider:** 04-5259 | Medicare: | 0 | SNF: | |
| **State License:** 1107 | Caid/Care: | 140 | NF/SNF: | X |
| **State Vendor:** 0844 | Private Beds: | 0 | ICF/MR: | |
| **MMIS Provider:** 212718311 | HomestyleBeds: | | ICF/MR10: | |

### II. OWNERSHIP AND FINANCIAL INTEREST

| **Type of Entity:** | **Building Ownership** |
|---|---|
| **Limited Liability Company** | Landlord:  Woodland Hills HC Property Holdings, LLC |
| | 1145 Hembree Road, Roswell, GA  30076 |
| | Tenant: |
| | Highlands of Little Rock Riley Holdings, LLC |
| | 8701 Riley Drive |
| | Little Rock, AR  72205 |

#### Ownership and Financial Interest

Highlands of Little Rock Riley Holdings, LLC

doing business as  Hillview Post Acute and Rehabilitation Center

Skyline Highland Holdings, LLC         100% of Highlands of Little Rock Riley Holdings, LLC .
JS Highland Holdings, LLC              100% of Skyline Highland Holdings, LLC
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas  72201

Joseph Schwartz 100% Member of JS Highland Holdings, LLC - Manager of Skyline Highland Holdings, LLC and
Manager of Highlands of Little Rock Riley Holdings, LLC
Management Agreement with Skyline Services Group LLC
505 Marlboro Road, Wood-Ridge, NJ  07075  Telephone - 201-635-1195
Joseph Schwartz 100% Member of Skyline Services Group LLC and CEO of Skyline Services Group LLC
Brandon Augustyniak - CFO of Skyline Services Group LLC

Effective April 1, 2016 - Change of Ownership
[Formerly Highlands of Little Rock Riley, LLC Doing business as Highlands of Little Rock at Woodland Hills
Therapy and Living Center]

Effective 11/07/2016 - Facility Name Change [Previous doing business as name was Highlands of Little Rock at
Woodland Hills Therapy and Living Center]

**EXHIBIT**

**F**

# Little Rock Post Acute and Rehabilitation

Telephone: (501) 664-6200                                    FAX Number: (501) 664-6832

## I. FACILITY DATA

Updated: ##########

| | |
|---|---|
| **MAILING ADDRESS** | Administrator: **Brittney DeVazier** |
| | Adminintrator License Number: **2416** |
| 5720 West Markham Street | Total Licensed Beds: **154** |
| Little Rock, AR 72205 | |
| | Life Safety Code Years: **2000** |
| **PHYSICAL LOCATION** | |
| 5720 West Markham Street | |
| Little Rock, AR 72205 | Certification: **Title XIX/VIII** |
| County: Pulaski-East #60-4 | |

| **Facility Identification Numbers** | **Certified Beds: 154** | | **Classification** | |
|---|---|---|---|---|
| | Medicaid: | 0 | NF: | |
| Federal Provider: 04-5450 | Medicare: | 102 | SNF: | |
| State License: 1105 | Caid/Care: | 52 | NF/SNF: | X |
| State Vendor: 0893 | Private Beds: | 0 | ICF/MR: | |
| MMIS Provider: 212642311 | HomestyleBeds: | | ICF/MR10: | |

## II. OWNERSHIP AND FINANCIAL INTEREST

| **Type of Entity:** | **Building Ownership** |
|---|---|
| **Limited Liability Company** | Landlord: Little Rock HC&R Property Holdings, LLC |
| | 1145 Hembree Road, Roswell, GA 30076 |
| | Tenant: |
| | Highlands of Little Rock West Markham Holdings, LLC |
| | 5720 West Markham Street |
| | Little Rock, AR 72205 |

### Ownership and Financial Interest

Highlands of Little Rock West Markham Holdings, LLC

doing business as   Little Rock Post Acute and Rehabilitation

Skyline Highland Holdings, LLC          100% of Highlands of Little Rock West Markham Holdings, LLC
JS Highland Holdings, LLC                100% of Skyline Highland Holdings, LLC
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas 72201

Joseph Schwartz 100% Member of JS Highland Holdings, LLC - Manager of Skyline Highland Holdings, LLC and
Manager of Highlands of Little Rock West Markham Holdings, LLC
Management Agreement with Skyline Services Group LLC
505 Marlboro Road, Wood-Ridge, NJ 07075 Telephone - 201-635-1195
Joseph Schwartz 100% Member of Skyline Services Group LLC and CEO of Skyline Services Group LLC
Brandon Augustyniak - CFO of Skyline Services Group LLC

Effective April 1, 2016 - Change of Ownership
[Formerly Highlands of Little Rock West Markham, LLC Doing business as Highlands of Little Rock at Midtown
Therapy and Living Center]

Effective: 11/07/2016 - Facility Name Change [Previous doing business as name was Highlands of Little Rock at
Midtown Therapy and Living Center]

# North Little Rock Health and Rehabilitation Center

Telephone: (501) 758-3800                                FAX Number: (501) 753-3893

## I. FACILITY DATA                                        Updated: ##########

**MAILING ADDRESS**

2501 John Ashley Drive
North Little Rock, AR 72114

**PHYSICAL LOCATION**

2501 John Ashley Drive
North Little Rock, AR 72114
County: Pulaski-North #60-2

| | |
|---|---|
| Administrator: | Cindi Dughetti |
| Adminintrator License Number: | 1820 |
| Total Licensed Beds: | 140 |
| Life Safety Code Years: | 1967 |
| Certification: | Title XIX/XVIII |

**Facility Identification Numbers**

Federal Provider:    04-5385

State License:    1106
State Vendor:    0864

MMIS Provider:    212707311

| Certified Beds: 140 | | Classification | |
|---|---|---|---|
| Medicaid: | 0 | NF: | |
| Medicare: | 0 | SNF: | |
| Caid/Care: | 140 | NF/SNF: | X |
| Private Beds: | 0 | ICF/MR: | |
| HomestyleBeds: | | ICF/MR10: | |

## II. OWNERSHIP AND FINANCIAL INTEREST

**Type of Entity:**

Limited Liability Company

**Building Ownership**

Landlord: Northridge HC&R Property Holdings, LLC
1145 Hembree Road, Roswell, GA 30076
Tenant:
Highlands of North Little Rock John Ashley Holdings, LLC
2501 John Ashley Drive
North Little Rock, AR 72114

### Ownership and Financial Interest

Highlands of North Little Rock John Ashley Holdings, LLC

doing business as  North Little Rock Health and Rehabilitation Center

Skyline Highland Holdings, LLC          100% of Highlands of North Little Rock John Ashley Holdings, LLC
JS Highland Holdings, LLC          100% of Skyline Highland Holdings, LLC
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas 72201

Joseph Schwartz 100% Member of JS Highland Holdings, LLC - Manager of Skyline Highland Holdings, LLC and
Manager of Highlands of North Little Rock John Ashley Holdings, LLC
Management Agreement with Skyline Services Group LLC
505 Marlboro Road, Wood-Ridge, NJ 07075 Telephone - 201-635-1195
Joseph Schwartz 100% Member of Skyline Services Group LLC and CEO of Skyline Services Group LLC
Brandon Augustyniak - CFO of Skyline Services Group LLC

Effective April 1, 2016 - Change of Ownership
[Formerly Highlands of North Little Rock John Ashley, LLC Doing business as Highlands of North Little Rock
Therapy and Living Center]

Effective: 11/07/2016 - Facility Name Change [Previous doing business as name was Highlands of North Little
Rock Therapy and Living Center

## Capital Health and Rehabilitation Center

Telephone: (501) 374-7565                                  FAX Number: (501) 372-8026

### I. FACILITY DATA
                                                           Updated:  ########

| MAILING ADDRESS | | |
|---|---|---|
| | Administrator: | Angala Tart |
| | Admininistrator License Number: | 2158 |
| 1516 Cumberland St | Total Licensed Beds: | 120 |
| Little Rock, AR 72202 | | |
| | Life Safety Code Years: | 1985 |
| PHYSICAL LOCATION | | |
| 1516 Cumberland St | | |
| Little Rock, AR 72202 | Certification: | Title XIX/XVIII |
| County: Pulaski-South #60-1 | | |

| Facility Identification Numbers | Certified Beds: 120 | | Classification | |
|---|---|---|---|---|
| | Medicaid: | 0 | NF: | |
| Federal Provider:   04-5359 | Medicare: | 0 | SNF: | |
| State License:    1108 | Caid/Care: | 120 | NF/SNF: | X |
| State Vendor:     0186 | Private Beds: | 0 | ICF/MR: | |
| MMIS Provider:   212735311 | Homestyle Beds: | | ICF/MR10: | |

### II. OWNERSHIP AND FINANCIAL INTEREST

| Type of Entity: | Building Ownership |
|---|---|
| Limited Liability Company | Landlord: APH&R Property Holdings, LLC<br>1145 Hembree Road, Roswell, GA 30076<br>Tenant:<br>Highlands of Little Rock South Cumberland Holdings, LLC<br>1516 Cumberland Street<br>Little Rock, AR 72202 |

#### Ownership and Financial Interest

Highlands of Little Rock South Cumberland Holdings, LLC

doing business as  Capital Health and Rehabilitation Center

Skyline Highland Holdings, LLC        100% of Highlands of Little Rock South Cumberland Holdings, LLC
JS Highland Holdings, LLC             100% of Skyline Highland Holdings, LLC
425 West Capitol Avenue, Suite 3800
Little Rock, Arkansas  72201

Joseph Schwartz 100% Member of JS Highland Holdings, LLC - Manager of Skyline Highland Holdings, LLC and
Manager of Highlands of Little Rock South Cumberland Holdings, LLC
Management Agreement with Skyline Services Group LLC
505 Marlboro Road, Wood-Ridge, NJ  07075  Telephone - 201-635-1195
Joseph Schwartz 100% Member of Skyline Services Group LLC and CEO of Skyline Services Group LLC
Brandon Augustyniak - CFO of Skyline Services Group LLC

Effective April 1, 2016 - Change of Ownership
[Formerly Highlands of Little Rock South Cumberland, LLC Doing business as Highlands of Little Rock at
Cumberland Therapy and Living Center]

Effective: 11/07/2016 - Facility Name Change [Previous doing business as name was Highlands of Little Rock at
Cumberland Therapy and Living Center]

7/25/2017                                 Arkansas Secretary of State

ELECTRONICALLY FILED

2017
60CV-17-3
C06D12 : 1 Pa

ARKANSAS
SECRETARY OF STATE
*Mark Martin*

*Search Incorporations, Cooperatives, Banks and Insurance Companies*

Printer Friendly Version
LLC Member information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | SKYLINE HIGHLAND HOLDINGS, LLC |
| Fictitious Names | |
| Filing # | 811096474 |
| Filing Type | **Limited Liability Company** |
| Filed under Act | **Domestic LLC; 1003 of 1993** |
| Status | **Good Standing** |
| Principal Address | |
| Reg. Agent | **HEARTSILL RAGON III** |
| Agent Address | **425 W. CAPITOL AVE STE 3800** |
| | **LITTLE ROCK, AR 72201** |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

**Purchase a Certificate of Good**          **Pay Franchise Tax for this corporation**
**Standing for this Entity**

EXHIBIT
**G**



ELECTRONICALLY FILED

2017-Jul-25
60CV-17-38
C06D12 : 1 Page

ARKANSAS
SECRETARY OF STATE
*Mark Martin*

*Search Incorporations, Cooperatives, Banks and Insurance Companies*

Printer Friendly Version
LLC Member Information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | HIGHLANDS OF LITTLE ROCK RILEY HOLDINGS, LLC |
| Fictitious Names | HIGHLANDS OF LITTLE ROCK AT WOODLAND HILLS THERAPY AND LIVING CENTER HILLVIEW POST ACUTE AND REHABILITATION CENTER |
| Filing # | 811096483 |
| Filing Type | Limited Liability Company |
| Filed under Act | Domestic LLC; 1003 of 1993 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | HEARTSILL RAGON III |
| Agent Address | 425 W. CAPITOL AVE STE 3800 |
| | LITTLE ROCK, AR 72201 |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

Purchase a Certificate of Good          Pay Franchise Tax for this corporation
Standing for this Entity



EXHIBIT
**H**

ELECTRONICALLY FILED
2017-Jul-21
60CV-17-30
C06D12 : 1 Page



ARKANSAS
SECRETARY OF STATE
*Mark Martin*

*Search Incorporations, Cooperatives, Banks and Insurance Companies*

Printer Friendly Version
LLC Member Information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | HIGHLANDS OF LITTLE ROCK WEST MARKHAM HOLDINGS, LLC |
| Fictitious Names | HIGHLANDS OF LITTLE ROCK AT MIDTOWN THERAPY AND LIVING CENTER LITTLE ROCK POST ACUTE AND REHABILITATION |
| Filing # | 811098478 |
| Filing Type | Limited Liability Company |
| Filed under Act | Domestic LLC; 1003 of 1993 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | HEARTSILL RAGON III |
| Agent Address | 425 W. CAPITOL AVE STE 3800 |
| | LITTLE ROCK, AR 72201 |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

Purchase a Certificate of Good Standing for this Entity     Pay Franchise Tax for this corporation


EXHIBIT I



7/25/2017                                    Arkansas Secretary of State

ELECTRONICALLY FILED
60CV-17-38
C06D12 : 1 Page

ARKANSAS
SECRETARY OF STATE
*Mark Martin*

## *Search Incorporations, Cooperatives, Banks and Insurance Companies*

Printer Friendly Version
LLC Member Information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | HIGHLANDS OF NORTH LITTLE ROCK JOHN ASHLEY HOLDINGS, LLC |
| Fictitious Names | HIGHLANDS OF NORTH LITTLE ROCK THERAPY AND LIVING CENTER<br>NORTH LITTLE ROCK HEALTH AND REHABILITATION CENTER |
| Filing # | 811096475 |
| Filing Type | Limited Liability Company |
| Filed under Act | Domestic LLC; 1003 of 1993 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | HEARTSILL RAGON III |
| Agent Address | 425 W. CAPITOL AVE STE 3800 |
| | LITTLE ROCK, AR 72201 |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

Purchase a Certificate of Good    Pay Franchise Tax for this corporation
Standing for this Entity



EXHIBIT
J

7/25/2017                                     Arkansas Secretary of State

```
┌─────────────────────────────┐
│ ELECTRONICALLY FILED        │
│                             │
│        2017-06-23           │
│        60CV-17-880          │
│   C06D12 : 1 Page           │
└─────────────────────────────┘
```

ARKANSAS
SECRETARY OF STATE
*Mark Martin*

## Search Incorporations, Cooperatives, Banks and Insurance Companies

Printer Friendly Version
LLC Member Information is now confidential per Act 865 of 2007

Use your browser's back button to return to the Search Results

Begin New Search

For service of process contact the Secretary of State's office.

| | |
|---|---|
| Corporation Name | HIGHLANDS OF LITTLE ROCK SOUTH CUMBERLAND HOLDINGS, LLC |
| Fictitious Names | CAPITAL HEALTH AND REHABILITATION CENTER HIGHLANDS OF LITTLE ROCK AT CUMBERLAND THERAPY AND LIVING CENTER |
| Filing # | 811096479 |
| Filing Type | Limited Liability Company |
| Filed under Act | Domestic LLC; 1003 of 1993 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | HEARTSILL RAGON III |
| Agent Address | 425 W. CAPITOL AVE STE 3800 |
| | LITTLE ROCK, AR 72201 |
| Date Filed | 02/17/2016 |
| Officers | ROBERT BEACH , Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | |
| State of Origin | N/A |

Purchase a Certificate of Good          Pay Franchise Tax for this corporation
Standing for this Entity

```
┌──────────────────┐
│     EXHIBIT       │
│                  │
│       K          │
│   _____     │
└──────────────────┘
```

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25 15:30:26
60CV-17-3863
C06D12 : 11 Pages

## NURSING HOME ADMISSION AGREEMENT

This NURSING HOME ADMISSION AGREEMENT ("Agreement") is made this _____ day of _____, _____ by and between _____ d/b/a _____ (the "Facility"), a skilled nursing facility located at _____, and _____ (the "Resident") and _____ (the Resident's "Legal Representative" or "Responsible Party", as defined below) for the admission of the Resident to the Facility.

PLEASE READ THIS AGREEMENT CAREFULLY..

### I.    DEFINITIONS

**A.    Legal Representative.**  A Legal Representative is any person with the legal authority to act on behalf of an incompetent or incapacitated patient (e.g., a legal guardian or agent with power of attorney).

**B.    Responsible Party.**  A Responsible Party is a family member or other person interested in the Resident's welfare who undertakes certain responsibilities in connection with the Resident's stay at the Facility.  If the Resident has a Legal Representative, the Resident's Legal Representative generally should serve as the Resident's Responsible Party.

**C.    Representative.**  Throughout this Agreement, the terms "Legal Representative" and "Responsible Party" shall be referred to collectively as "Representative."

**D.    Resident.**  Throughout this Agreement, the term "Resident" herein shall refer to the Resident as well as the Resident's Representative, unless the context clearly indicates otherwise, notwithstanding the fact that some provisions contained in this Agreement refer both to the Resident and the Representative.

### II.    TERM AND TERMINATION

This Agreement is effective on the earlier of the date that it is signed or the date that the Resident is admitted to the Facility.  The Agreement will continue in full force and effect until any party terminates it, provided, however, that if the Representative desires to terminate this Agreement solely as it applies to him or her, such termination shall be in writing and shall only apply to those provisions related to the Representative.

1



EXHIBIT

## III.    RIGHTS AND OBLIGATIONS OF THE FACILITY

**A.    Provision of Services.**  The Facility shall provide, arrange for the provision of, or make available, the services as described below:

1.    <u>Facility Services</u>.  The Facility agrees to provide the Resident with the following: (a) the routine nursing services and supplies; (b) such personal services as may be required for the health, safety, good grooming, and well-being of the Resident; (c) basic room and board; (d) dietary services, to include three meals per day, unless otherwise medically indicated; (e) blankets, bed linens, towels, and washcloths; (f) laundering of linens and towels; (g) housekeeping services; and (h) activity programs and social services programs as established by the Facility. The Facility is required by law to exercise reasonable care toward the Resident; however, the Facility is not an insurer of the health, safety, and welfare of the Resident and assumes no liability as such.

2.    <u>Ancillary Services and Supplies</u>.  The Facility will provide certain ancillary services and supplies at the option and upon the request of the Resident, or upon the direction of the Resident's attending physician. Such ancillary services are not covered by the Facility's Daily Rate. The ancillary services offered by the Facility are subject to change from time to time at the discretion of the Facility.

3.    <u>Services of Other Providers</u>.  The Facility makes available, from time to time, the services of outside healthcare providers. These services are made available at the Resident's expense and in accordance with the Facility's policies and procedures. Any outside healthcare provider must be properly licensed or registered under state law, and must comply with all applicable regulations and Facility policies.

**B.    Hospital Transfers.**  In the event that a physician orders the Resident to be transferred to a hospital, the Facility agrees to make arrangements for the transfer. Any charges associated with the transfer shall be the responsibility of the Resident.

**C.    Bed Hold Policy.**  Upon request, the Facility shall hold the Resident's bed when the Resident is away from the Facility for therapeutic leave or hospitalization, as long as the applicable bed hold fee is paid. The daily bed hold fee is the current charge for the Resident's bed. Although Medicaid may pay all or a portion of the bed hold fee under certain circumstances if the Resident's stay is covered by Medicaid, the Resident in such event must still pay any applicable Patient Portion (as defined in Section IV.A.2. of this Agreement) in accordance with state law. A copy of the Facility's bed hold policy will be provided to you upon admission.

**D.    Transfer and Discharge.**

1.    <u>Resident Initiated</u>.  The Resident may terminate this Agreement upon notice and removal of all belongings from the Facility. If the Resident leaves the Facility for any reason other than a medical emergency or death, the Facility requests thirty (30) days advance notice of the transfer, discharge, or termination of this Agreement.

2

2.    Facility Initiated Discharge.  The Facility may terminate this Agreement and transfer or discharge the Resident in accordance with state and federal law if: (a) a transfer or discharge is necessary for the Resident's welfare and the Resident's needs cannot be met in the Facility; (b) the Resident's health has improved sufficiently so that the Resident no longer needs the services provided by the Facility; (c) the safety or health of individuals in the Facility is or otherwise would be endangered; (d) the Resident has failed, after reasonable and appropriate notice, to pay for (or to have paid by a third party or treated as paid under Medicare, Medicaid, or other government program) charges for the Resident's care and stay at the Facility; (e) the Facility ceases to operate; or (f) any other reason permitted by law.

E.    Room Changes.  To the extent permitted by applicable state law and regulations, the Facility reserves the right to transfer the Resident to another unit, room, or bed within the Facility consistent with the safety, care, and welfare needs of the Resident.  The Facility reserves the right to transfer or change the Resident's room or any roommate when the Facility determines that it is appropriate to do so.

F.    Personal Needs Account.  The Resident may leave personal spending money with the Facility.  To do so, a Resident must authorize the Facility to manage the Resident's funds and establish a personal needs account to be maintained by the Facility.  The Facility will provide this service without charge.  The Resident may access the Facility's records of the Resident's account upon reasonable request.  The Facility will provide the Resident with a quarterly accounting of all funds held in trust.

G.    Complaints and Grievances.  If the Resident believes that he or she has been mistreated in any way or that the Resident's rights have been or are being violated by Facility personnel or another resident, or in any other way, the Resident shall make such complaint known to the administrator of the Facility and follow the Facility's grievance procedure.  The Resident's use of the Facility's grievance procedure does not prohibit the Resident from reporting grievances to the state or local ombudsman or to a state regulatory agency.  Information regarding the Facility's grievance policy and procedure is set forth on Exhibit "D" to this Agreement.

H.    Death of Resident.  In the event of the Resident's death, the Facility shall notify the person(s) designated by the Resident.  The Facility is authorized to arrange for the transfer of the Resident's body to the designated funeral home.  The Resident's estate is responsible for the payment of all costs associated with the transfer and funeral expenses.

I.    Capacity of Resident and Guardianship.  If the Resident is or becomes unable to understand or communicate, and is determined by a physician to be incapacitated, then, in the absence of the Resident's prior designation of an authorized legal representative, or upon the unwillingness or inability of the legal representative to act, the Facility shall have the right, but not the obligation, to commence a legal proceeding to have the court appoint a guardian or conservator for the Resident.  The costs of the legal proceedings, including attorney's fees, shall be the responsibility of the Resident or the Resident's estate.  Should the Resident be adjudicated incompetent and have no ability to be restored to legal capacity, the Resident's rights and responsibilities shall be exercised by the court-appointed representative.

3

IV.    **PAYMENT FOR SERVICES**

    A.    <u>Charges.</u>  The Facility's Daily Rate is determined in part by the type of room assigned and the level of care provided to the Resident.  For this reason, the rate may change if the Resident moves to a different room.  In many instances, all or part of a resident's stay at the Facility will be paid for by Medicare, Medicaid, or a third party payment source, such as private insurance.  The Resident agrees to pay or ensure that payment is made to the Facility for services and items provided by the Facility to the Resident in accordance with the following provisions, as applicable.

       1.    <u>Private Pay Residents.</u>  If the Resident's care is not covered and paid for by Medicare, Medicaid, or another third party payment source, the Resident agrees to pay the Daily Rate established for the type of room the Resident is placed in, as well as the amount of any specific ancillary charges related to items or services that the Facility provides to the Resident or arranges to have provided to the Resident.  The Facility's current private pay Daily Rates and a list of items and services included and not included in the Facility's Daily Rate are set forth on Exhibit "A."  Even when the Resident has private insurance, the Resident remains primarily responsible for paying all Facility charges.  All charges not covered by a third party payor, including coinsurance or deductible amounts, are the responsibility of the Resident, to the extent allowed under federal and state law.  One month's room and board charge, prorated based upon the day of the month that the Resident is admitted to the Facility, is payable to the Facility at the time of admission.  For each additional month of the Resident's stay, the Resident agrees to pay the Facility in advance on or before the tenth (10th) day of the month.  Any unused advance payment shall be refunded if the Resident becomes covered by Medicaid or Medicare or leaves the Facility before the end of the month.  The Facility will provide a monthly invoice that itemizes all charges incurred by the Resident.  The Facility will bill room and board charges in advance and all ancillary charges in arrears.  The Facility shall provide the Resident a detailed list of the charges for items and services not covered by the Facility's Daily Rate.  This list shall also be available for review from the Facility's business office during normal business hours.

       2.    <u>Medicaid Residents.</u>  If the Resident is a Medicaid recipient at the time of admission, then it is expected that the state Medicaid program will pay for much of the Resident's care at the Facility.

         a.    The items and services covered by Medicaid, as well as those items and services that are not covered by Medicaid and the charges for those non-covered items and services, are listed on Exhibit "B" to this Agreement.  If the Resident requests that the Facility provide items or services that are not covered by Medicaid, then the Resident shall be responsible for the payment for such items and services.

         b.    In addition to the amounts paid by the state Medicaid program for the Resident's care, the state Medicaid program sets an amount of money  that the Resident must pay to or have paid to the Facility (referred to in this Agreement as the "Patient Portion").  On a monthly basis, the Facility will bill the Resident the amount of

4

the Patient Portion and the amount of any non-covered items or services received by the Resident. The Resident agrees to pay such amounts in accordance with the terms of this Agreement. From time to time, the state Medicaid program may make adjustments to the Patient Portion owed by the Resident. In the event the state Medicaid program makes such an adjustment retroactively, the Resident agrees to pay the adjusted amount to the Facility within thirty (30) days of notice of the adjustment.

        c.    If the Resident's Medicaid coverage expires or lapses for any reason, then the Resident shall be classified as a Private Pay Resident, and the terms of this Agreement applicable to Private Pay Residents shall apply to the Resident.

    3.    <u>Medicaid Pending Residents</u>.  Residents who are eligible for Medicaid benefits, but who have not enrolled in the state Medicaid program, will be referred to as Medicaid Pending Residents. If the Resident is or becomes a Medicaid Pending Resident, the following provisions of this Paragraph shall apply.  The Resident and the Resident's Representative agree to take all steps necessary to apply for Medicaid benefits for the Resident and to enroll the Resident in the state Medicaid program *as soon as possible after admission to the Facility*.  The Resident and the Resident's Representative agree to provide the state Medicaid program and the Facility with such statements of the Resident's assets, income, or other information that is required for completion of the Medicaid application program in compliance with any deadlines set by the state or county Medicaid program.  If the Resident's Medicaid eligibility is pending, the Facility reserves the right to collect a pre-payment or deposit from the Resident and will hold any such funds in escrow while the application is pending.  If the Resident is declared eligible, the deposit/pre-payment will be refunded to the Resident (less any Patient Portion due).  If the Resident is declared ineligible for Medicaid, the deposit/pre-payment shall be applied against the amount owed by the Resident and the Resident shall be classified as a Private Pay Resident, and the terms of this Agreement applicable to Private Pay Residents shall apply to the Resident.

    4.    <u>Medicare Residents</u>.  The Resident may be eligible to have all or part of the Resident's stay in the Facility paid for by the Medicare program.  A list of the items and services covered by Medicare Part A, as well as a list of those items and services not covered by Medicare Part A, are set forth on Exhibit "C" to this Agreement.   Even though the Resident's stay may be covered by Medicare, the Resident may be required to pay coinsurance.   The Facility will send the Resident a monthly invoice listing any coinsurance amounts along with charges for non-covered items and services.   The Resident agrees to make payment to the Facility for such amounts in accordance with the terms of this Agreement.  Because Medicare coverage is temporary, if the Resident remains in the Facility after the Resident's Medicare coverage expires, the Resident agrees either to: (i) pay the Facility the then-current private pay Daily Rate plus the Facility's customary charges for ancillary services; or (ii) make other arrangements to have the Resident's care paid for (e.g., through the Medicaid program or private insurance).  If Medicare denies payment for the Resident's stay in the Facility, then to the extent allowed by law, the Resident shall be classified as a Private Pay Resident and the terms of this Agreement applicable to Private Pay Residents shall apply to the Resident.

5

5.     Other Payment Sources. If the Resident's stay is covered and paid for by any other payment source, the Resident agrees to pay the Facility any applicable deductible, copayment, coinsurance, or other amount, including payment for items and services not covered by such third party payment source, in accordance with the terms of this Agreement.

B.     Assignment of Benefits. The Resident authorizes the Facility to make claims and take other actions to secure receipt of payments for the Facility from any third party payor to reimburse the Facility for its charges related to the Resident's stay and care. To the fullest extent permitted by law, as security for payment of the Facility's charges, the Resident hereby assigns to the Facility the Resident's right to any third party payments now or subsequently payable to the extent of all charges due. The Resident shall endorse and turn over to the Facility any payments received from third parties to the extent necessary to satisfy charges by the Facility.

C.     Modification of Charges. The Facility reserves the right to change from time to time the amount of any of its charges or how and when charges are computed, billed, or become due. The Facility shall provide advance written notice of any such changes to its charges. If, at any time, the Resident's condition requires that the Facility change the Resident's level of care, the Resident's daily rate may be changed to the daily rate for the new level of care without prior notice, unless such notice is required by state law or regulation.

D.     Due Dates and Obligations to Pay Timely. Facility charges for items and services provided to the Resident shall be billed monthly to the Resident. These charges are due and payable by the tenth (10th) day of each month, unless a different deadline is prescribed by state law, in which case charges shall be due and payable in accordance with such deadline. If payment is not received by the date that it is due and payable, the account balance is considered past due or delinquent, and the Facility may add a late charge to the Resident's account as permitted by law. The Resident is obligated to pay any late charge. Such late charge shall be assessed on the monthly balance at the lesser of the monthly rate of 1.5% or the maximum amount permitted by law. The late charge does not alter any of the obligations of the Facility or the Resident under this Agreement. The Resident acknowledges that the Facility does not offer credit or accept installment payments. The Facility's acceptance of a partial payment does not limit the Facility's rights under this Agreement. The Resident's failure to make full payment within fifteen (15) days after the due date shall be grounds for termination of this Agreement and discharge from the Facility, in accordance with the terms of this Agreement and applicable federal and state law. The Resident agrees to pay the reasonable expense of collection, including costs, disbursements, and attorneys' fees in an amount equal to fifteen percent (15%) of the outstanding amount due, including interest.

E.     Fee For Returned Checks. The Facility will charge the Resident a service fee of twenty-five dollars ($25.00) or the actual fee charged by the bank, whichever is greater, for any returned check.

6

## V.    RIGHTS AND OBLIGATIONS OF THE RESIDENT

**A.    Compliance with Facility Rules.** The Resident agrees to comply with all rules, regulations, policies, and procedures of the Facility regarding resident conduct and responsibilities, a copy of which shall be provided upon admission. All policies and rules applicable to residents' conduct and responsibilities are available for review during business hours upon reasonable request to the Administrator of the Facility. The Facility may amend its rules and policies from time to time and will make its best effort to notify the Resident of any substantial changes. Notwithstanding any other provision of this Agreement, the Facility's rules, regulations, policies, and procedures shall not be construed as imposing a contractual obligation upon the Facility or granting any contractual rights to the Resident.

**B.    Full Disclosure and Determination of Medicaid Eligibility.** The Resident is obligated to make full and complete disclosure regarding all financial resources and income during the application process. *If the Resident is not Medicaid-eligible at the time of admission, the Resident and the Resident's Representative shall notify the Facility at the point at which the Resident's resources will be exhausted within ninety (90) days.* The Resident is obligated to apply for Medicaid benefits at such time as the Resident's resources are no longer sufficient to pay for the cost of the Resident's care and stay at the Facility. Because the approval process may be lengthy, the Resident and the Resident's Representative agree to give the Facility a ninety (90) day advance notice to allow for any delays in the processing of the Resident's Medicaid application. The Resident and the Resident's Representative are obligated to cooperate fully in any Medicaid eligibility determination or re-determination process. In the event that the Resident's eligibility for Medicaid benefits is denied, interrupted, or terminated due to the failure of the Resident or the Resident's Representative to cooperate in the application or determination process, the Resident shall be responsible for the applicable private pay daily rate plus any applicable charges for ancillary services and supplies.

**C.    Cooperation with Facility and Payors.** The Resident and the Resident's Representative shall at all times cooperate fully with the Facility and any third party payor to secure any payments for items or services provided to the Resident.

**D.    Federal and State Resident Rights.** The Resident has certain rights enumerated under federal and state law. Summaries of the federal and state resident rights provisions shall be provided to the Resident upon admission. Notwithstanding any provision of this Agreement to the contrary, the rights guaranteed to the Resident pursuant to federal and state law shall not be construed as imposing a contractual obligation upon the Facility or granting any contractual rights to the Resident.

**E.    Consent to Treatment.** By signing this Agreement, the Resident and/or the Resident's Representative authorizes and directs the Facility to provide routine nursing care and other health care services as directed by the Resident's attending physician. The Resident hereby authorizes Facility to provide or arrange for any emergency medical treatment deemed necessary for the Resident or to arrange for the Resident's transfer to a hospital or other facility for such purposes.

7

**F.**    **Issuance of Advance Directives.**  The Resident may issue an advance directive in accordance with state law that describes the Resident's wishes with respect to treatments that may be administered or withheld in the event that the Resident becomes unable to make health care decisions.  The Facility's policy on advance directives shall be provided upon admission.

**G.**    **Physician Services.**  The Resident acknowledges that the Facility provides services based upon the instructions and orders of physicians, and that the Facility is not obligated to provide the Resident with any medicines, treatments, special diets, or equipment without specific orders from a physician.  The Resident agrees to select an attending physician who will visit the Resident regularly in accordance with the Facility's policies and procedures, federal and state law, and as dictated by the Resident's needs.  The Resident agrees to remain under the care of an attending physician throughout the Resident's stay at the Facility.   If the Resident does not or is unable to select an attending physician, an attending physician may be designated by the Facility.  The Resident authorizes the Facility to contact the Resident's attending physician or any designated alternative at any time regarding the Resident's care.  In the event that the Resident's attending physician and any designated alternative are unavailable or have not seen the Resident in accordance with the timeframes established by law, the Resident authorizes the Facility to select a physician to see the Resident and write temporary orders until the Resident's attending physician is available.  In such event, the Resident authorizes and directs the Facility to provide such services as are required for the Resident's well-being, health, and safety, in accordance with the orders of such physician.  The Resident shall be solely responsible for payment of all charges of any physician who renders care to the Resident in the Facility.

**H.**    **Pharmaceutical Services.**  The Resident agrees to select a pharmacy or pharmacist for those pharmaceutical supplies and services not provided by the Facility as part of the basic daily rate.  The pharmacy or pharmacist selected by the Resident must conform to the Facility's medication packaging and delivery systems or procedures.  The Resident agrees to pay for medications unless they are otherwise paid for by Medicare, Medicaid, or other third party payor.

**I.**    **Right to Leave.**  The Resident's stay at the Facility is voluntary.  The Resident may leave the Facility temporarily on therapeutic leave at any time such leave has been authorized by the Resident's attending physician.  The Resident agrees to abide by the Facility's bed hold policy whenever the Resident leaves the Facility temporarily.  The Resident agrees that, if the Resident plans to leave the Facility temporarily, the Resident will provide the Facility with advance notice of such plans, including the how long the Resident expects to remain away from the Facility, in order to allow the Facility to consult with the Resident's attending physician.  The Resident agrees to follow the rules and policies of the Facility regarding signing out of and into the Facility whenever the Resident leaves and returns to the Facility.   The Resident acknowledges and agrees that the Facility is not responsible for the health, safety, or welfare of the Resident if the Resident leaves the Facility with or under the care of any person not directly employed by the Facility.  The Resident acknowledges and agrees that that all responsibility of the Facility for the Resident shall terminate in the event that the Resident knowingly leaves the Facility against the medical advice of the Resident's attending physician and/or without the approval of the Facility.

8

**J.**   **Resident's Personal Property.**   The Facility desires to provide the Resident with a home-like environment, and the Resident is encouraged to bring personal items from home to the Facility.   Nevertheless, common sense must be used, and the Facility strongly discourages the Resident from keeping valuable jewelry, papers, large sums of money, or other items considered of value, whether monetary or sentimental, in the Facility.   The Resident is responsible for furnishing and maintaining the Resident's own clothing and personal items. The Facility shall make reasonable efforts to safeguard the Resident's property/valuables that the Resident chooses to keep in his or her possession.   An inventory form listing the Resident's personal items shall be completed by the Resident at the time of admission.   If, at any time during the Resident's stay, new items of value are added to or current items are taken out of the Resident's possessions in the Facility, the Resident agrees to so inform the Facility Administrator or designee.   The Facility assumes no liability for the security of personal items retained by the Resident or kept in the Resident's room.   All articles retained by the Resident shall be the responsibility of the Resident.   The Resident may purchase, at the Resident's expense, casualty insurance to cover potential damage to or loss of any of the Resident's personal property.   At the time of transfer or discharge, the Facility shall only be accountable for the Resident's personal property items that the Facility has accepted for safekeeping.   The Resident must make arrangements to remove the Resident's personal property from the Facility within seventy-two (72) hours after discharge unless alternate arrangements are made with the Facility. Personal property of the Resident that is not removed from the Facility within seventy-two (72) hours after discharge may be removed in a manner deemed appropriate by the Facility.

**K.**   **Use of Personal Furnishings and Medical Equipment.**   The Facility encourages the Resident to have a home-like environment, and will attempt to accommodate all reasonable requests to individualize the Resident's room.   For safety reasons, the Facility must approve any addition or rearrangement of furniture, hanging of pictures, posters, or other similar activities. The Resident may use his or her personal furniture, medical equipment, and similar items to the extent practicable, and provided that such items meet Facility safety standards and do not infringe upon the rights of other residents or pose a danger to the health or safety of individuals in the Facility.

**L.**   **Indemnification.**   The Resident shall pay for any damages or injuries caused by the Resident to other persons, residents, or staff and shall indemnify and hold the Facility harmless from any claims, actions, or proceedings against the Facility resulting from the Resident's actions or omissions.

## VI.   OBLIGATIONS OF THE RESIDENT'S REPRESENTATIVE

**A.**   **General Obligations.**   The Resident's Representative is not required to guarantee payment of any of the Facility's charges as a condition of the Resident's admission, expedited admission, or continued stay in the Facility; however, if the Representative has lawful access to the Resident's income or resources available to pay for the Facility's care, the Representative agrees by signing this Agreement, to pay the Resident's financial obligations out of the Resident's funds.   The Representative shall be personally responsible for compliance with all other terms of this Agreement.   The Representative agrees to assist in the preparation, completion, and submission, if applicable, of the Resident's application for Medicaid benefits, and acknowledges that the failure timely to assist in the Medicaid application process may result

9

in the discharge of the Resident for non-payment. In the event that the Resident applies for Medicaid benefits, the Representative shall arrange for the designation of the Facility as representative payee for any Social Security-related benefits or other income sources of the Resident, in an amount not to exceed the amount of co-payment or deductible due from the Resident.

      **B.**    **Potential Personal Liability.** The Representative shall be obligated to pay to the Facility from the Representative's own resources as liquidated damages an amount equivalent to any payments or funds of the Resident that are available to pay for the Resident's care, but that the Representative withholds, misappropriates for personal use, or otherwise does not turn over to the Facility for payment of the Resident's financial obligations under this Agreement, or an amount equivalent to revenue lost by the Facility due to the Representative's failure to cooperate in the Medicaid application process for the Resident.

## VIII.  MISCELLANEOUS PROVISIONS

      **A.**    **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State in which the Facility is located,. This Agreement shall be binding upon and inure to the benefit of each of the undersigned parties and their respective heirs, personal representatives, successors, and assigns.

      **B.**    **Severability.** The various provisions of this Agreement are severable one from another. If any provision of this Agreement is found by a court or administrative body of proper jurisdiction and authority to be invalid, the other provisions shall remain in full force and effect as if the invalid provision had not been a part of this Agreement.

      **C.**    **Entire Agreement.** This Agreement, together with any attached exhibits, represents the entire understanding between the parties, and supersedes all previous representations, understandings, or agreements, whether oral or written, between the parties.

      **D.**    **Waiver of Provisions.** The Facility reserves the right to waive any obligation of the Resident under the provisions of this Agreement in its sole and absolute discretion. No term, provision, or obligation of this Agreement shall be deemed to have been waived by the Facility unless such waiver is in writing by the Facility. Any waiver by the Facility shall not be deemed a waiver of any other term, provision, or obligation of this Agreement, and the other obligations of the Resident under this Agreement shall remain in full force and effect.

## IX.  LIST OF EXHIBITS

      The Resident acknowledges that the Facility has informed the Resident orally and provided a written copy of the following documents and that the Resident has had an opportunity to ask any questions regarding this Agreement or the Exhibits listed below:

- **Exhibit "A":** Facility Private Pay Daily Rate and Services

10

- **Exhibit "B":** Items and Services Included and Not Included in the Medicaid Rate
- **Exhibit "C":** Items and Services Included and Not Included in the Medicare Rate
- **Exhibit "D":** Acknowledgements and Consents

11

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2017-Jul-25 15:30:26
60CV-17-3863
C06D12 : 2 Pages

**CONTRACT**
**TO PARTICIPATE IN THE ARKANSAS NURSING HOME PROGRAM**
**ADMINISTERED BY THE DIVISION OF ECONOMIC AND MEDICAL SERVICES**
**OFFICE OF LONG TERM CARE**
**UNDER TITLE XIX (MEDICAID)**

This __Facility__ agreement made and entered into this the _____ day of _____
(to be completed by DMS)                           (to be completed by DMS)
by and between _____ hereinafter called Provider, and
(to be completed by DMS)
the Department of Economic and Medical Services, Office of Long Term Care hereinafter called State.

WITNESSTH:

I.   Provider agrees that its responsibilities hereunder shall be as follows:

A.  To keep all records, as set forth in applicable Federal and/or State regulations, and Long Term Care Provider Manuals, and any duly promulgated changes in or additions thereto, and to fully disclose the extent of all services provided to individuals receiving assistance under the State Plan.

B.  To make available for inspection all records herein specified to satisfy audit requirements under the program; to furnish all such records for audit conduction periodically by State or its designated agents and/or representatives of the Department of Human Services, and the Department of Health and Human Services of the United States of America or its designees or representatives. For all Medicaid recipients these records shall include, but not necessarily be limited to those records as defined in Section A above.

C.  Provider shall at all times provide State access to the facility, residents, and resident records. Provider expressly agrees not to hinder, impede, or otherwise restrict State from carrying out its official duties, and expressly agrees to reasonably assist State in carrying out its official duties. In this context, "official duties" include inspections, surveys and investigations and reviews as prescribed by State and Federal laws, rules and regulations, and shall allow "observation and recordings made and conducted relative to long term care facilities, long term care residents, and records of or possessed by facility and/or residents. 'Observation' includes the right and ability to move in or around the interior and/or exterior, including resident rooms of a long term care facility, unaccompanied (except upon request if the inspector[s]) at any time. 'Recordings' include photostatic copies, notes, writings, drawings, and photographs (whether still or motion, in accordance with Section 2 of Ark. Act 33 of 1989), and sound recordings."

D.  To accept only residents who have met the requirements of the duly promulgated Pre-Admission Screening Program and for whom the facility can provide all required and necessary services. Provider specifically herein agrees to insure availability of all medications prescribed by the resident's physician.

E.  To provide all services without discrimination on the grounds of race, color, national origin, or physical or mental disability within the provisions of Title VI of the Federal Civil Rights Act, and Section 504 of the Rehabilitation Act of 1973. Provider agrees herewith that it has been furnished with a copy of the LTC Provider Manual, and shall be bound by all provisions thereof, including any and all changes and/or additions thereto.

F.  To comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State.

G.  To meet all requirements of applicable Life Safety Code and all State Fire and Safety Codes.

H.  Provider will not transfer or discharge any recipient without a minimum of 30 days advance notice to the individual or a responsible person. Provider may transfer or discharge a Medicaid recipient under the following circumstances:

1.  The transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

2.  The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

3.  The safety of the individuals in the facility is endangered;

4.  The health of individuals in the facility would otherwise be endangered;

5.  The resident has failed, after reasonable and appropriate notice, to pay (or to have paid under Title XIX or Title XVIII on the resident's behalf an allowable charge imposed by the facility for an item or service requested by the resident and for which a charge may be imposed consistent with federal and state laws and regulations; or

6.  The facility ceases to operate.

The notice of transfer or discharge must be made at least 30 days in advance of the resident's transfer or discharge except:

a.  In a case described in item H(3) or H(4) above;

b.  In a case described in item H(2) above where the resident's health improves sufficiently to allow for a more immediate transfer or discharge;

c.  In a case described in item H(1) above where a more immediate transfer or discharge is necessitated by the resident's urgent medical needs; or

d.  In a case where the resident has not resided in the facility for 30 days.

I.   Provider shall give 30 day notice to the State prior to any change of ownership including a change which contemplates or provides for the assumptions of existing liabilities by the new owner.

EMS-711 (R. 9/89)

**EXHIBIT M**

1 of 2

J. To bill State (Medicaid) only after the service has been provided.

K. To accept Medicaid reimbursement rates determined by the State as full payment for all Medicaid eligible care and services required by the classification of each resident and rendered by the provider, and make no additional charges to the resident, or to accept any additional payment from the resident, relatives, or responsible parties for that service which is covered under the Medicaid Program.

L. To promptly refund to the resident or responsible party any unused portion of recipient applied income collected in advance and not owed due to death, discharge or transfer. Recipient income is to be prorated on a per diem basis according to the number of days in the month.

M. To promptly refund to a resident or other responsible person any deposit or entrance fee collected while awaiting approval for Medicaid eligibility to the extent those days are covered by Medicaid payments.

N. To provide all services and specific items as defined in the Medical Assistance Reasonable Cost Related Reimbursement Manual for Long Term Care Facilities (MARCRRM-LTCF), or any additions thereto or subsequent manuals. Receipt of Medicaid per diem reimbursement rates is considered payment in full for services and items included in the MARCRRM.

O. To accept assignment and file a claim in a timely and proper manner with all third party sources, and if said claim is collected from a third party, to reimburse Medicaid up to the amount Medicaid paid for said services.

P. The $30 Personal Needs Allowance which is provided for by the Medicaid Program for personal expenditures of a resident cannot and shall not be used for any other purpose except as authorized in writing by the resident or responsible party.

Q. To comply with all State and/or Federal regulations pertaining to resident personal funds and to provide the State access to patient account records or any other financial records maintained by the provider for benefit of the patient. The new owner must specify in writing which owner will be responsible for recipient Medicaid claims and facility account receivable balances resulting from dates of service prior to the ownership change.

Further Provider agrees that it will not prevent or interfere with the individual or responsible person, or the Office of Long Term Care in the transfer or discharging of a patient when same is appropriate.

II. The State agrees that it shall have the following responsibilities hereunder:

A. To make timely payments to Provider for the appropriate Medicaid services provided the eligible Medicaid recipients in accordance with the terms of the LTC Provider Manual or other appropriate regulations and procedures previously mentioned herein.

B. To notify Provider of any changes of rules or regulations to be followed hereunder as promptly as is practicable at all times.

C. To safeguard the confidentiality of any Medicaid records maintained for the State, its agents, and/or fiscal intermediary as specified in Federal and State regulations.

III. Mutual Covenants, Duties, Responsibilities, and Undertakings

A. State and Provider mutually agree to comply with all Federal and State laws, rules and regulations.

B. State and Provider agree that the rights and privileges of the residents are of primary concern to the parties and the parties expressly agree and covenant to protect and preserve those rights and privileges and that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement and may result in immediate termination of this agreement without recourse.

C. State and Provider agree and covenant that this written instrument constitutes the entirety of the agreement between both parties and no statement or representations not reduced to writing or incorporated herein by express reference shall be binding upon the parties and such statements or representations not incorporated herein by express reference or not contained herein shall constitute no part of this agreement.

IV. This contract may be terminated in accordance with the following provisions:

A. This contract may be terminated by either party by giving 30 days written notice to the other party.

B. This contract may be terminated immediately by State for the following reasons:

1. Federal sanction of Provider.

2. Change of ownership.

3. Violation of any provision herein contained.

4. In accordance with termination procedures as set out in appropriate Federal and/or State regulations or rules by which Provider is bound hereunder.

| Provider | | Division of Economic and Medical Services Office of Long Term Care |
|---|---|---|
| By: _____ | | By: _____ |
| (Signature) | | (Signature) |
| Name: _____ | | Name: Carol Shockley |
| (Type Name) | | (Type Name) |
| Title: Administrator | | Title: Director, LTC |
| Date: _____ | | Date: _____ |

EMS-711 (R. 9/89)